PITMAN, J.
| fin these consolidated cases, a jury convicted Defendant Tremond Thomas of second degree murder and aggravated burglary. For the second degree murder conviction, the trial court sentenced Defendant to life imprisonment at hard labor with parole eligibility after 35 years. For the aggravated burglary conviction, the trial court sentenced Defendant to 30 years at hard labor to run concurrently with the life sentence. Defendant appeals. For the following reasons, we affirm his conviction and sentencé of second degree murder and vacate his conviction and sentence for aggravated burglary.

FACTS

On December 10, 2012, a grand jury filed a bill of indictment charging 15-year-old Defendant with first degree murder in violation of La. R.S. 14:30(A)(1), stating that, on or about September 24, 2012, Defendant committed the first degree murder of Iesha Winbush. On December 18, 2012, the bill of indictment was amended to charge Defendant with second degree murder in violation of La R.S. 14:30.1. The bill of information was orally amended in open court on May 5, 2014, to second degree murder. On December 18, 2012, Defendant was formally arraigned and entered a plea of not guilty.
On April 5, 2013, Defendant filed a motion to suppress statements. A hearing on the motion to suppress was held on April 23 through April 25, 2013., On May 2, 2013, the trial court filed an order denying the motion to suppress.
On May 5, 2014, a bill of information was filed charging Defendant with aggravated burglary of an inhabited dwelling in violation of La. |gR.S. 14:60(1), alleging that, on or. about October 12, 2012,[1] Defendant and *266 Randolph Andrew committed aggravated burglary of the dwelling located at 638A Patton Street in Bossier City while armed with a dangerous weapon or committing a battery therein. The parties agreed that the charge of aggravated burglary should be consolidated into the trial for second degree murder because the charges arose out of the same facts and allegations. Defendant waived a formal reading of the charge and entered a denial.
Trial began on May 5, 2014. Sgt. Darren Barclay of the, violent crimes unit of the Bossier City Police Department testified that, on September 23, 2012, he responded to a duplex located at 638 Patton Street in Bossier City, Louisiana, to investigate a shooting. He stated that law enforcement received a search warrant for the residence and then began an investigation. He and the jury were shown photographs of the crime scene, and he testified about these photographs. He noted that the events at issue occurred on the right side of the duplex, i.e., 638A Patton Street. In photographs of the exterior of the duplex, he identified the front porch and a door on the side of the house. A television and a Madden videogame box were located in the living room. He also described the bedroom where the victim, Iesha Winbush, was found. He noted that a television had been turned upside.down, the bed’s mattress had been turned on the box springs and there was blood on the bed sheets, the mattress and the box springs. He pointed out a bloody 'sock and a bloody towel and noted that Ms. Winbush was found lying in a pool of blood next to the bed. He testified that he obtained an arrest warrant for Taurus Carter and arrested him on October 3.
|sTaurus testified that, in September 2012, he and Ms. Winbush had been boyfriend and girlfriend for three or four months and were living .together at 638 Patton Street, which he recently purchased with money he received as the beneficiary of his mother’s life insurance policy. He stated that, on the evening of September 23, 2012, he and Ms. Winbush went to Sonic to get something to eat and then returned to his house. His brother Demetrius Carter and his cousin Ricky Corley were at the house to play a PlayStation 3 (“PS3”) videogame. After his brother and Mr. Corley left, he and Ms. Winbush took their food into the bedroom to eat. He went to get ketchup and heard a knock at the front door. 'He stated that there was a young, light-complexioned black man at the door asking if someone named John lived there. He responded that he had the wrong address and that no one named John lived there. As he was about to close the door, another man jumped out from the side of the house with a revolver and started shooting from the front porch. He ran to a door on the side of the house and then ran across the street, jumped a fence and ran to a house bn McDade Street because it looked like a safe place. He stated that he did not know the person who lived at the house and that he knocked on the door and asked if he could use the phone. He then called his brother and told him he had been robbed. His brother and cousin picked him up and took him back to his house. When he arrived at the house, he entered through the side door and began to look for Ms. Winbush and for his gun. He testified that he found her in the back bedroom in a puddle of blood. He searched for a gun he kept in the house, but could not find it. He stated that he then ran outside and sat on the front porch and cried. He noted that his brother Demetrius was the first to find Ms. Winbush lying *267 on the floor and called 911. He testified that, |4when law enforcement arrived, he was lying on the porch. The police officers took him to the police station-.and questioned him for a day and a half. During his questioning, he identified someone named “Meechie” as the shooter. He stated that, after he left the police station, he stayed with his grandmother instead of returning to his house. It was seyeral days later when he learned from,family members that his PS3 console was missing, so he called the police station to tell them the serial number on the PS3 container box. The police officers told him to bring the box to the police station. He and his brother went to the station, and he remained in the truck while his brother took the box inside. The police officers then came outside and arrested him and charged him with second degree murder. He was then booked into jail and stayed there for approximately eight days until he was released. He testified that he did not kill Ms. Winbush,
On cross-examination, Taurus denied that he was a convicted felon and stated that there was.no reason he could not own a gun. He stated that he first saw that Ms. Winbush was dead and then discovered that his gun was missing. He did not render aid to Ms. Winbush, but told police that he put white towels down, even though he did not actually do this. He denied that he spoke- with neighbors Robert McHenry and Raquel Davis that evening. He could not explain why there was no evidence that bullets had been fired. He stated that he called his brother instead of 911 because he was scared. He had just received $70,000 as his mother’s life insurance beneficiary and believed someone came to his house to “chase” him, not to harm Ms. Winbush. He picked Demetrius Hamilton, i.e., Meechie, out of a photo lineup as the shooter, but explained that he was not 100 percent certain that he was the shooter. He clarified that Mee-chie is not his cousin. pHe denied having an argument with Ms. Winbush the night she was killed, denied shooting her and denied making the bedroom look like there had been a struggle.
Ricky Corley testified that, on the night of September 23, 2012, he was playing catch with Demetrius Carter in the front yard of Taurus’s house. He stated that Taurus and Ms. Winbush came home with food and he spoke with them briefly before leaving with Demetrius Carter to go to his house in Shreveport. Approximately ten minutes later they received a call from Taurus that someone had tried to rob him, so they immediately drove back to Taurus’s house. When they arrived at the house, Demetrius Carter knocked on the door and no one answered. They called Taurus, who stated he was at a house one street over. He testified that they went to pick up Taurus, who. he described, as “jittery,” “nervous” and “scared.” When they -returned to Taurus’s house, he remained outside while Demetrius Carter and Taurus went to the front door and used a key to enter the house. He stated that he heard Demetrius Carter call out Ms. Win-bush’s name and later said that she “was gone.” He noted that Taurus ran outside and “fell out on the front porch” and was crying.
Jeremy Watson testified that, from his house located at 607 Patton Street, he can see the front of the house located at, 638 Patton Street, but that he does.not know Taurus. He stated that, on the evening of September 23, 2012, he heard at least one gunshot around 10:00 p.m. as he was. sitting on his porch. He had a clear view of the street and did not see any vehicles drive up to 638 Patton. He did not call the police because hearing gunshots is not unusual in his neighborhood; however, he knew something was out of the ordinary *268 when police officers arrived. On cross-examination, he- stated |fithat, when sitting on his porch, he cannot see the opposite side of the street because of a privacy fence. He further stated that, in the 20 minutes between the gunshot and the police arriving, he did not see anyone jump over a fence into his yard and that, if someone had jumped • over the fence, he would have seen him.
Stephen Raley testified that, late in the evening of September 23, 2012, a man came to his house at 613 McDade Street in Bossier City. He had never met this man before, but now knows his name is Taurus. He stated that he was alerted by his dog’s barking that someone was at the door. When he opened the door, Taurus asked him if he was bleeding or shot. He stated that he turned on" his porch light to examine Taurus and noted that he was not bleeding, but was sweating profusely. He stated that he allowed Taurus to use his phone. Taurus called his brother several times and then his brother came and picked him up. On cross-examination, he agreed that he previously made a statement that Taurus smelled of alcohol and was intoxicated and described him as antsy, fidgety and jumpy and would hide when cars drove by. He noted that the driver of the car that arrived to pick up Taurus told him that Taurus drinks too much and that he needed to tell him who did this.
Demetrius Carter testified that, on the evening of September 23, 2012, he and his cousin Ricky Corley went to his brother Taurus’s house to play the Madden game on the PS3. He Stated that, when they got to the house, his brother was not home, so he and Mr. Corley threw a football in the yard. His brother and Ms. Winbush arrived with Sonic bags and he told them that he was going to take his cousin home, but that they would probably come back later. He testified that, as he was driving to Shreveport, he received a 17call from Taurus, who said that someone had just tried to rob him, but he did not know who it was. Taurus sounded hurt and asked him to come get him, so he hurried to go get to his brother. He first went to Taurus’s house and knocked on the door; but no one answered. He then called the phone number Taurus had called him from and spoke to a man who told him that Taurus was at his house on McDade Street. He then drove one street over to McDade Street and was flagged down by a man at the house. He stated that he ran to the porch where Taurus was lying on the ground and holding his shoulder. He examined Taurus and determined that he had not been shot. He, Taurus and his cousin Ricky got in the car to go check on Ms. Winbush at Taurus’s house. Once inside the house, he noted that Taurus went left toward the living room and he went right toward the bedroom. He testified that, when walking down the hallway, he saw Ms. Winbush’s body lying on the floor. He called her name and got down on his knee next to her and shook her shoulder, but she did not show any signs of life so he called 911. The dispatcher told him to put towels on Ms. Winbush, and he responded that there was nothing he could do for her and that they needed the paramedics to arrive as soon as - possible. He stated that there was a small puddle of blood near Ms. Winbush’s stomach and that he did not look to see if there was blood anywhere else in the room. At some point, Taurus came into the room and started crying. The paramedics then arrived and told him to leave the house. When he went outside, he saw Taurus lying on the front porch, holding his shoulder; He stated that police officers arrived and put each person in a different police car and transported them to the police station. They were released several hours *269 later. He also stated that he waited until the next morning to return to Taurus’s house. The first thing he |8noticed was that the PS3 was missing. He took the PS3 container box to the police station because he thought the PS3 had likely been taken to a pawn shop. On cross-examination, he testified that he does not recall Taurus stepping over Ms. Winbush’s body, but he (Demetrius) was so focused on- her that he did not notice anything going on around him. He stated that Taurus said he had a gun, but he had never seen it.
Robert McHenry testified that he lived in the other half of the duplex where Taurus lived. He stated that, on the evening of September 23, 2012, he was not home when Ms. Winbush was killed. He admitted that he told police officers he had been home because he “was jumped on by the officers” and “had to say something.” He pled guilty to the charge of criminal mischief for giving these false statements. He also testified that he was arrested on the evening of September 23, 2012, for disturbing the peace by appearing in an intoxicated condition. On cross-examination, he said he was not threatened by the Carter family and emphasized that he had to lie to the police to keep them from hitting- him. He stated that he was not home when Ms. Winbush was killed and that he does not recall making other statements to the police, including that he heard Ms. Winbush and Taurus arguing, that he had fallen asleep and was awakened by a gunshot, that he saw Taurus come out of his house holding a gun, that he asked Taurus what he had done or that Taurus cocked the gun and held it like he was going to shoot him.
Raquel Davis testified that, on September 23, 2012, she lived down the street from Taurus. She stated that she saw Taurus early in the evening when she took him a cigarette. She then went home and later heard sirens and saw crime scene tape around his house. She stated that, when asked by |9police officers who stayed in the house, she responded that Taurus lived there, but did not list Robert McHen-ry, who lived in the other part of the duplex. She told the officers she had seen Demetrius Carter’s truck, but had not seen him. On cross-examination, she stated- that she did not recall speaking to á detective after that night and that the detective’s report indicating she had said she walked down the street to borrow a dollar from Taurus and saw him, Demetrius Carter, Robert McHenry and “Crazy Chris” -at 9:30 that night was wrong.
Det. Lindsey Harvey, a certified print examiner with the Bossier City Police Department, testified that, on September 23 and 24, 2012, she was involved in the investigation of a'violent crime involving Ms. Winbush. She noted physical evidence collected in this case, including the socks and shoes Taurus was wearing, a backpack taken from Top Dollar Pawn, a PS3 controller, projectiles taken from the victim that were obtained from the coroner’s office, a projectile recovered from the bedroom floor, paperwork found in the duplex, a shirt worn by Taurus and the PS3 recovered from the pawn shop. She stated that they did not collect any shell casings at the scene.- The projectiles and Taurus’s shirt were sent to the 'crime lab. She testified that she lifted fingerprints from the crime scene and compared them to fingerprints of persons involved in the case, including Taurus and Defendant, but was unable to obtain a match.
Sgt. Brad Kálmbach of the Bossier City Police Department testified that, on the night of September 23, 2012, he was called to assist Det. Harvey in a homicide investigation. When he arrived on the scene, he was asked to return to the police station to *270 perform gunshot residue tests on several individuals, which he explained are collected and evaluated on the spot, as 110opposed to being sent off to a lab for testing. He stated that the swabbing from Taurus’s hands did not indicate any gunshot residue. He testified that, if someone had fired a gun, he would expect to find gunshot residue. On cross-examination, he confirmed that, if someone wore gloves while shooting a gun, gunshot residue would not be found on their hands. He also noted that, if a person washed his hands after shooting a gun or sweated profusely, those activities could impact the test. He agreed that, just because the test did not show gunshot residue, does not mean that the person did not fire a gun.
Monnie Machalik, a forensic DNA analyst with the North Louisiana Criminalis-tics Laboratory, testified that she examined stains on a shirt to determine if they were blood. She stated that a stain on the lower right of the back of the shirt was a mixture of blood from two individuals— Ms. Winbush was the major contributor and Taurus was a minor contributor. She explained that this is consistent with blood from one person (Ms. Winbush) and sweat from another (Taurus) because there is a higher DNA concentration in blood than in sweat or skin cells. She testified that the stain on the neckline of the front of the shirt was consistent with a mixture of blood of at least two people, and Ms. Win-bush and Taurus could not.be excluded as donors of the DNA.
Dr. Long Jin, a forensic pathologist with the Department of Pathology for LSU Health Science Center, testified that he performed the autopsy on Ms. Winbush on September 24, 2012. He stated that the cause of death was multiple gunshot wounds to the head, abdomen and upper extremities. He also stated that the fatal wounds were the gunshots to her head. He noted a laceration on the back of her head and explained that this type of laceration hfis usually caused by blunt force trauma by some kind of object. He testb fied that he was able to recover three bullets from the body of Ms. Winbush.
Carla White, a firearms examiner with the North Louisiana Criminalistics Laboratory, testified that she examined four bullets involved in this case. She stated that .the bullets were .38 or .375 magnum caliber and were all fired. from the same weapon.
Christopher Hicks testified that, on September 24, 2012, he pawned a PS3 that was in a black backpack. He stated that Defendant gave him the backpack and the PS3 when he was sitting with his stepson, Randolph “Randy” Andrew. He pawned the PS3 at Top Dollar Pawn and. received $90 for it. The game Madden 2013 was in the PS3..He stated that he gave the money to Defendant and Randy Andrew. On cross-examination, he. stated that he did not know how long Defendant and Randy Andrew had had the PS3. .
Ofc. Joseph. Thomerson, the pawn shop coordinator for the Bossier City Police Department, testified that investigators asked him to run a serial number on a game system on Leads Online, a website used by pawn shops and law enforcement to track pawn shop transactions. He stated that the serial number he ran matched a PS3 at Top Dollar Pawn and he determined that Christopher Hicks pawned it on September 24, 2012. He and an-investigator recovered the PS3 and a backpack from Top Dollar Pawn.
Ofc. Tifani Brinkman of the Bossier City Police Department testified that she was the lead investigator in 'this matter. She noted that the murder occurred on a Sunday, that she worked on the case during the week and then on Saturday or Sunday (September 28 or. 29), she went out of town *271 for a week for previously scheduled training. She stated that, at the time she left, |12no warrants of arrest had been issued. While she was gone, she learned that Taurus had been - arrested. When she returned, she followed up on information that had been gathered during the course of the investigation, including the stolen PS3. She stated that she obtained the serial number of the PS3 and then asked a detective to run it through Leads Online. The transaction was located, and she then interviewed Mr. Hicks, who admitted that he pawned the PS3 for his step-son and his friend. She testified that she spoke with Randy Andrew about how he came to be in possession of the PS3.
Ofc. Brinkman also testified that, on the evening on October 11, 2012, she and Sgt. Barclay interviewed Defendant at Calvary Ball Fields. She stated that Defendant’s mother, Trisa Thomas, arranged the meeting and was present for the interview. She explained that Defendant was hot a suspect at that time. She read him his Miranda rights, and he and his mother signed a form for the interrogation of juveniles before she interviewed him.
A recording of the October 11 interview was played for the jury. In this interview, Ofc. Brinkman told Defendant that she wanted to talk to him about an incident involving a PS3. Defendant said that he, Randy and Kentrell walked to a house, went to the front door and knocked, and no one answered. Then they went to the side door on the right side of the house, and the door was open so they walked in. He described the interior of the house—to the left was the front room, to the right was a bedroom. He also drew an accurate map of the house. Defendant stated that he went to the living room, took the PS3 and left. He explained that they went to the house on Patton Street because Randy said there was money in the house, but they did not know-whose house it was. He mentioned that Randy said the money | iswould be under the couch, but he did not look under the couch. He stated that he only took the PS3 and controllers and put them in a backpack he brought with him. He noted that he did not know what Randy was doing in the bedroom and that Randy did not leave with him. Randy did not help him look for the money, which he thought at the time was strange. He stated that Kentrell left before they went into the house. He called out to Randy and told him that he got a PS3. After leaving, he left the PS3 in the backpack on a trail. Two days later, he and Randy discussed pawning the PS3 to get money and decided to get Randy’s step-father, Mr. Hicks, to pawn it. He. noted that Mr. Hicks did not ask them whose PS3 it was, and they did not tell him where they got it. He stated that he and Randy accompanied Mr. Hicks to Top Dollar Pawn and they received $100 for the PS3. Defendant received $30, Randy received $30 and Mr. Hicks received $40 for gas money. He admitted that he had heard about a homicide, but did not realize it had happened at that house until the police told him the day of his interview. He stated that no one talked about a gun and no gun was taken from the house. He also stated that the burglary happened at sundown on either Friday, Saturday or Sunday, and they pawned the PS3 on Monday.
Once the interview recording was finished playing, Ofc. Brinkman continued her testimony. She stated that, after they concluded the interview with Defendant, she and Sgt. Barclay returned to the police station and made contact with Det. Hardesty, who had been interviewing Randy Andrew and his mother. The next morning, they compared Defendant’s and Randy Andrew’s statements looking for internal inconsistencies. She noted an important inconsistency regarding the time- *272 line of when they had indicated they broke into the house. She stated that she took three statements from | UD efend ant on October 12 and each time advised him of his rights.[2] She noted that, in between statements, she and Sgt. Barclay would investigate and try to corroborate or disprove information given by Defendant.
The recording of the first interview from October 12, 2012, was played for the jury. In this interview, Defendant stated that “Boosie” had a gun and he (Defendant) thought Boosie is the “one who killed her” because he is the only one who had a gun. He stated that he, Randy, Kentrell and Boosie went to the house to see if there was money there. He knocked on the door and no one answered. Boosie then knocked on the door and “the dude” answered the door. He could not explain what “the dude” looked like. He stated that he then heard a gunshot. When he first walked up to the house, he did not know Boosie had a gun, but then he heard the gunshot. He said Randy was with him, but he did not know where Kentrell was. He saw someone running down the street. He explained that he then went back to the house and entered through the front door. He heard screaming from the back room and saw someone wearing a white shirt run out the side door.. He assumed that Boosie hit Ms. Winbush when he heard her scream and stated that she said, “don’t hit me no more.” He said he and Randy stayed in the front room and got the PS3 and left. He then heard a second series of gunshots coming from the back of the house as they approached the street. He noted that Boosie was alone in the house. He stated that he never saw a gun, but noted that Boosie told him he would throw the gun in the river. He admitted that, when he was inside the house, he walked down the hallway and saw a girl lying on the floor, but she was not dead. He said that she was |isballed up and screaming, and Boosie was in the room with a gun in his hand. He did not know what kind of gun it was, but said that it had a big clip. He said he did not see if she was bleeding. Defendant said that he heard more than one gunshot when he was walking toward the street and then he ran. He stated that he had the PS3, and he took it to the trail.
Ofc. Brinkman explained to the jury that that recording began in the middle of her conversation with Defendant. She stated that Defendant had been “going back and forth” about the timeline of events. She told him that, if he could not tell her for sure when the burglary happened, one of the others involved would try to pin the murder on him. She stated that, when he responded “just me?” she then began recording the interview because she believed that Defendant may have been involved in the homicide. She testified that, after the interview ended, she spoke with Sgt, Barclay about what she had learned and then began a second interview with Defendant.
The recording of the second interview from October 12, 2012, was played for the jury. In this interview, Defendant stated that, on the day of the murder, he, Kent-rell, Randy and Boosie (whose name is Aaron) were walking down Patton Street because Randy said that there was supposed to be money under a couch in a house on that street: He explained that he knocked on the door and no one answered, so he walked off. Boosie, who was holding a gun, then walked up and knocked on the front door and a man wearing a white shirt opened the door. He said Boosie shot the gun, so he (Defendant) ran down the street. He noted that *273 he also saw someone in a white shirt running down the street. He and Randy then came back to the house and went inside the front door. He admitted that he grabbed the PS3 and put it in his backpack. While he was in the house, he heard a girl h (¡screaming in the back room. He and Randy walked down the hallway and saw a girl balled up on the floor and had her hands up like she was protecting her head. There was a clip on the floor next to her, but he did not see a gun. He explained that Boosie was in the room and was pointing a gun at her. He and Randy then ran out of the house and heard gunshots as soon as they reached the yard. He hid the backpack with the PS3 on a trail behind a tire shop and then called Kentrell. He told Kentrell that Boosie just killed someone. He said he spoke to Randy the next day about pawning the PS3. He stated that, the next day at school, Boosie told'him that he threw the gun in the river. He admitted that, when he and his friends first went to the house, they planned to commit a burglary, not to rob anyone.
Ofc. Brinkman testified that she then contacted Sgt. Barclay and Det. Hardesty to inform them about Boosie, who they later identified as Aaron Jones. She stated that she showed Defendant a photo of Aaron Jones and he identified him as Boo-sie. She and Det. Hardesty then went to Bossier High School to bring Aaron Jones back to the station for an interview. She noted that both she and Det. Hardesty interviewed Aaron Jones, and they subsequently obtained a search warrant for his residence, which was executed by other officers. She testified that, based on Aaron Jones’s statement, the information they learned at his home and the statements gathered from his family by Det. Hardesty, they determined that he was not involved in the homicide. This process took several hours, and she noted that Defendant had remained at the station during this time. She stated that she then spoke with Defendant again.
The recording of the third interview from October 12, 2012, was played for the jury. In this interview, Defendant stated that he, Randy and 117Kentrell were walking down the street and stopped at a house. He said he knocked on the door and a man in a white shirt answered. He asked the man if somebody lived there and then Randy came up and shot inside the house. The man in the white shirt then ran out of the house. He noted that he did hot know Randy had a gun. He stated he ran away, and Randy entered the house. He then came back to the house and walked into the front room and took the PS3 and put it in his backpack. He then walked down the hallway and saw a girl balled up on the floor with her hands covering her head. He said that Randy was pointing a gun at her and asking her things like “where the money at.” Defendant said that the girl replied that she did not have anything. There was a clip on the floor next to.the girl and he saw her pull a gun out. He explained, that Randy asked her for the gun, and she handed it to him (Defendant). He walked away and then heard several gunshots, so he ran out of the house. He stated that Randy ran up behind him and then they met up with Kentrell. He hid the PS3 and backpack on a trail behind a tire shop. He noted that the gun he took from the girl was also in the backpack. He stated that, after school on Monday, he got the backpack and took it to Randy’s house. He said that he sold the gun to someone named TJ. He stated that he did-not know the girl was dead until his mother told him and that he thought Randy was shooting into the air. He admitted that he gave Boo-sie’s name as the shooter because he want *274 ed to blame it on someone other than Randy.
Ofc. Brinkman testified that she then spoke with Sgt. Barclay, and he contacted the district attorney’s office to advise them about what had transpired. Defendant was then charged with first degree murder and |18booked into the juvenile detention center.' She.also noted that Taurus was released from jail.
On cross-examination, Ofc. Brinkman was questioned about her initial police, report. She agreed that her report stated that the physical evidence and statements did not support Taurus’s statement of a home invasion. She noted that some detectives were concerned that the front door could not have been opened and that a cord behind the door would have been moved if the door was opened. She also noted that her report stated that two people would have run through the living room, i.e., Taurus and the gunman, but the furniture was not disturbed. She agreed that her report stated that they found no shell casings or bullet holes in the living room or kitchen even though Taurus claimed he was shot at while running. She testified that, in her report, she noted that the bedroom was in general disarray, but it appeared to be selectively disarrayed. Her report also stated that the pattern of blood on some towels made it appear as though someone could have been trying to clean' up blood, noting that the pools of blood near Ms. Winbush’s abdomen, left shoulder and head, and the positioning of two towels suggested that someone had attempted to render aid to her. She stated that Taurus first said that he did not own a gun, but later admitted that he did and also told her that he placed the towels around Ms. Winbush. She, testified that she found it odd that Taurus pointed to his lower left abdomen to indicate where Ms. Winbush had been.shot because he also said that he had not been in the room at all. She clarified that no one had told him where Ms. Winbush had been shot. The abdomen wound was not visible until the coroner moved her body, but- blood was visible. The report also stated that 118she asked Taurus about the blood on his shirt, particularly the blood on the back of his shirt, but he could not explain how it got there.
On cross-examination, Ofc. Brinkman testified about her interviews with Defendant. She noted that portions of his story changed and that his and Randy Andrew’s timelines were not the same as to whether the burglary happened on a Friday or Saturday. She expressed a concern that possibly Defendant and those with him had very bad luck that they burglarized a house where a homicide was committed a few days later.
An audio recording of a phone conversation between Defendant and his mother was played for the jury. Defendant was in jail when this conversation was recorded. He and his mother discussed the possibility of a plea bargain if he agreed to testify against Randy Andrew. They also discussed possible sentences he could receive if convicted and whether he would be treated as a juvenile or an adult.
The state rested its case, and the defense presented witnesses at trial. Det. Brandon Huckaby testified that, as part of the investigation, he spoke with Taurus, who said that his cousin Meechie shot at him. He noted that he was unable to find any bullet holes or projectiles in the home. ■He also discussed his observations about the entry way into Taurus’s house, explaining that is a tight area and it would have been difficult to fully open .the front door. He stated that there was a headboard against one wall, a couch against another wall and a lamp cord on the floor between the headboard and couch, which would *275 have prevented the door from opening. He testified that he spoke with . Robert McHenry, who did not know that Ms. Win-bush had been killed. He stated- that, when he told Mr. McHenry of the shooting, Mr. McHenry fell to the ground and cried. Mr. McHenry toldj^him that he had been drinking and smoked marijuana that evening,- heard arguing between Taurus and Ms. Winbush, fell asleep and was awoken by what he believed to be one or two gunshots. He noted that Mr. McHen-ry said he tried to go through a door between the duplex units, but it was locked so he went outside. Mr. McHenry told him that Taurus came outside and had a gun and said he was tired of people messing with him. Mr. McHenry ran when Taurus cocked the gun. Det. Huckaby denied beating Mr. McHenry, threating to beat him or seeing any other law enforcement officer beat him. He noted that Mr. McHenry subsequently recanted his statement and pled guilty to criminal mischief for making the statement.
Det. Michael Hardesty testified that bloody towels found in the same room as Ms. Winbush appeared to have been used to render aid or to clean the crime scene. He stated that he spoke with Taurus the night of and the day after the murder and Taurus showed no emotion about Ms. Win-bush being killed. He also stated that Taurus’s statements did not match the crime scene and the evidence.
Det. Darren Barclay testified as to an arrest affidavit used to establish probable cause for the arrest of Taurus, noting that such probable cause was based almost entirely'on inconsistencies in Taurus’s story. On cross-examination, he stated that this was based on the information he had at the time and that he continued the investigation after the arrest. He noted that .the investigation regarding the, PS3 led ■ to Taurus’s release from jail.
On May 8, 2014, the jury returned a verdict against Defendant of guilty as charged as to the charge of second degree murder and a verdict of guilty as charged as to the charge of aggravated burglary.
I ⅞1 On August 26, 2014, a sentencing hearing was held in accordance with Miller v. Alabama, La. C. Cr. P. art. 878.1 and La. R.S. 15:574.4(E). Defendant’s probation officer, Sandra Ersoff of the Office of Juvenile Justice, testified for the state. Defendant’s mother, Trisa Thomas, testified for the defense. For the second degree murder conviction, the trial court sentenced Defendant to life imprisonment at hard labor with parole eligibility after 35 years pursuant to La. R.S. 15:574.4(E). For the aggravated burglary conviction, the trial court sentenced Defendant to 30 years at hard labor to run concurrently with the life sentence.
On September 25, 2014, Defendant filed a motion to reconsider sentence. On March 31, 2015, a hearing was held on .the motion to reconsider sentence, which the trial court denied.
Defendant appeals.

DISCUSSION

Sufficiency of the Evidence— ■ Second Degree Murder ■
Defendant argues that there was insufficient evidence to prove that he was guilty beyond a reasonable doubt of the offense of second degree murder. He alleges that there was no proof that he intended to kill Ms. Winbush; and, therefore, he could not have been found guilty of second degree murder. He contends that the physical evidence at the crime scene, Taurus’s conduct on the night of Ms. Winbush’s murder and the Bossier City Police Department’s investigation establish a-> reasonable hypothesis of his innocence and a reasonable probability of misidentification. He notes *276 that his* “confession” is suspect. He argues that his description of entering the duplex through the front door after a shot was fired and of Taurus running out of the house were both proved to be impossible, or at least | ^critically suspect, by the physical evidence. He contends that Taurus’s conduct before, , during and after the murder of Ms. Winbush establishes a reasonable hypothesis of his innocence and/or misidentification. He further contends that Taurus identified an alleged shooter by name, described a home invasion that was not physically possible, admitted to trying to clean up blood, although his brother testified he never entered, the room, changed his story when confronted with crime scene evidence and failed to explain why his clothing had Ms. Win-bush’s blqod spatter on it. He notes that fingerprint evidence established that an unknown person or persons was/were present in the home when Ms. Winbush was murdered. He argues that the state failed to meet its burden of proof and the evidence was insufficient to prove all the elements of second degree murder.
The state argues that, viewing the evidence in a light most favorable to the state, a rational jury could conclude that it proved all the essential elements of second degree murder of Ms. Winbush beyond a reasonable doubt. It notes that Defendant is guilty of the crime of felony murder because Ms. Winbush was killed during the perpetration of an aggravated burglary, The evidence presented indicated that Defendant, participated in the burglary of the residence with the intention of. stealing the money -or some other item and. did, in fact, enter the.residence while one of his accomplices was armed with a gun and stole a PS3 and a gun.
The ■ standard of appellate review for a sufficiency of the evidence claim is “whether, after viewing the evidence in'the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hearold, |¾603 So.2d 731 (La.1992). See also La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165.
The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). A reviewing court may not impinge on the fact finder’s discretion unless it is necessary to guarantee the. fundamental due process of law. Id. The appellate court does not assess credibility or reweigh the evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
La. R.S. 14:24 sets forth the law of principals and states:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Thus, in order for Defendant’s conviction to be upheld, the record must establish that the state proved beyond a reason *277 able doubt all of the essential elements of second degree murder. The bill of indictment charged Defendant with second degree murder in. violation of La. R.S. 14:30.1, but did not specify if this charge was based on specific intent pursuant to La. R.S. 14:30.1(A)(1) and/or felony murder pursuant to La. R.S. 14:30.1(A)(2). I fyThe jury instructions charged the jury as to specific intent and felony murder with the underlying felonies of aggravated burglary and armed robbery.[3] Significantly, on appeal, the state only argues the theory of second degree murder pursuant to La. R.S. 14:30.1(A)(2), when the offender is engaged in the perpetration or attempted perpetration of aggravated burglary. The state does not argue that it proved second degree murder pursuant to La. R.S. 14:30.1(A), when the offender had the specific intent to kill or inflict great bodily harm, or La. R.S. 14:30.1(A)(2), when the offender is engaged in the perpetration or attempted perpetration of armed robbery.
La. R.S. 14:30.1(A) states, in pertinent part, that:
Second degree murder is the killing of a human being:
⅜ ⅜ ⅜
(2) When the offender is engaged in the perpetration or attempted perpetration of ... aggravated burglary ... even though he has no intent to kill or to inflict great bodily harm.
La. R.S. 14:60[4] defines aggravated burglary and states, in part:
Aggravated burglary is the unauthorized entering of any inhabited dwelling ... where a person is present, with the intent to commit a felony or any theft therein, if the offender,
(1) Is armed with a dangerous weapon; or
(2) After entering arms himself with a dangerous weapon; or
(3) Commits a battery upon any person while in such place, or in entering or leaving such place,.
hsLa. R.S. 14:67(A) defines theft and states:
Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
We find that the record establishes that the state proved beyond a reasonable doubt all of the essential elements of second degree murder pursuant to La. R.S. 14:30.1(A)(2), when the offender is engaged in the perpetration or attempted perpetration of aggravated burglary. Defendant entered 638A Patton Street, the residence of Taurus and Ms. Winbush, without authorization while Ms. Winbush was present *278 in ■ the residence. He entered the residence with the intent to commit a theft therein in that he and his friends intended to take money that was located in the residence and belonged to someone who lived in the residence without that person’s consent. His accomplice, Randy Andrew, was armed with a dangerous weapon, i,e., a gun, when they entered the house. He armed himself with a dangerous weapon after entering the residence when he took a gun from Ms. Winbush. Ms. Winbush was killed during the perpetration of aggravated burglary when she was shot multiple times. A rational jury could have found that the state proved the essential elements of second degree murder, when the offender was engaged in the perpetration of aggravated burglary, beyond a reasonable doubt. We note, however, the possibility of double jeopardy as Defendant was also convicted of aggravated burglary. This possible error will be discussed, infra.
Defendant presents many arguments in an attempt to demonstrate a reasonable hypothesis of his innocence. However, his statements to police, 12fiwhich were corroborated by Taurus’s testimony of events and the physical evidence of the PS3 tying him to 638A Patton Street, sufficiently proved beyond a reasonable doubt the elements of second degree murder.
Accordingly, this assignment of error lacks merit.
Sufficiency of the Evidence— Aggravated Burglary
Defendant argues that there was insufficient evidence to prove that he was guilty beyond a reasonable doubt of the offense of aggravated burglary. The state argues that, viewing the evidence in a light most favorable to the state, a rational jury could conclude that it proved all the essential elements of aggravated burglary of 638 Patton Street beyond a reasonable doubt.
Although Defendant has not raised a double jeopardy argument at the trial level or on appeal, a violation of double jeopardy apparent on the face of the record is reviewable as error patent. Generally, the double jeopardy clause prohibits prosecution for both a felony murder and the underlying felony. In the case sub judice, Defendant was convicted of both second degree murder, i.e., felony murder based on the underlying felony of aggravated burglary, and aggravated burglary,
A person cannot twice be put in jeopardy for the same offense. U.S. Const. Amend V; La. Const. Art. 1, § 15; La. C. Cr. P. art. 591. In State v. Smith, 95-0061 (La.7/2/96), 676 So.2d 1068, the Louisiana Supreme Court provided a thorough discussion of double jeopardy and stated:
Protection against double jeopardy is divided , into three fundamental guarantees, namely: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and, (3) protection against multiple punishment for the same offense. State v, Mayeux, 498 So.2d 701 (La.1986). North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 666 (1989)[ (1969) ].
|27Louisiana courts have applied two distinct tests to .determine whether offenses are the same for double jeopardy purposes. In Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the U.S. Supreme Court set out a precise rule of law to determine if a double jeopardy violation has transpired. The Blockburger test is as follows:
“The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions the test to be applied to deter *279 mine whether there are two different offenses or only one, is whether each provision requires proof of an additional fact which the other does not.”
[[Image here]]
The other standard employed by our courts is the “same evidence” test. This test tell[s] us:
“If the evidence required to support a finding of guilt of one crime would also have supported a conviction for the other, the two are the same under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one. The test depends on the evidence necessary for a. conviction, not all of the evidence introduced at trial.”
This court in State v. Coates, 27,287 (La.App.2d Cir.9/27/95), 661 So.2d 571, writ denied, 95-2613 (La.2/28/96), 668 So.2d 365, addressed double jeopardy regarding felony murder and the underlying felony and stated:
Where one of the offenses is felony murder, it- is well settled that conviction of both felony murder and the underlying felony is barred by double jeopardy. Harris v. Oklahoma, 433 U.S. 682, 97 S.Ct 2912, 53 L.Ed.2d 1054 (1977) (per curiam); State ex rel. Wikberg v. Henderson, 292 So.2d 505 (La.1974). The underlying felony, a lesser-included offense of felony murder, is considered the “same offense” for .double jeopardy purposes. Sekou v. Blackburn, 796 F.2d 108 (5th Cir.1986). When proof of the commission of a felony is an essential element of felony murder or attempted felony murder, Louisiana courts have held that the defendant cannot be convicted and punished for both the murder or attempted murder and the underlying felony. State ex rel. Wikberg, supra; State v. S.P., 608 So.2d 232 (La.App. 5th Cir.1992); State v. Lee, 554 So.2d 180 (La.App. 2d Cir.1989). Also generally, conviction of any lesser included offense of felony murder and I ?«the underlying felony violates double jeopardy. State v. Powell, 598 So.2d 454, 470 (La.App. 2d Cir.), writ denied, 605 So.2d 1089 (1992), and citations therein.
We find that, in the case sub judi-ce, the convictions for both felony murder and the underlying felony of aggravated burglary constitute a double jeopardy violation. We emphasize that the finding of a double jeopardy violation is specific to the facts of this case.
There is not a violation of double jeopardy when a defendant is convicted of second degree murder and an underlying felony when there is sufficient evidence to support second degree murder as a specific intent crime. See State v. Pendelton, 96-367 (La.App. 5th Cir.5/28/97), 696 So.2d 144, writ denied, 97-1714 (La.12/19/97), 706 So.2d 450; State v. Brown, 96-1002 (La.App. 5th Cir.4/9/97), 694 So.2d 435, writ denied, 97-1310 (La.10/31/97), 703 So.2d 19, We note that, in the case sub jvdice, although the jury was instructed with theories of second degree murder based on both specific intent and felony murder, the evidence presented at trial does not support a finding of specific intent. Further, the state on appeal did not argue that it proved second degree murder based on specific intent and, instead, solely argued that it proved second degree murder based on felony murder with the underlying felony of aggravated burglary.
In State v. Coates, supra, this court addressed double jeopardy in successive prosecutions and determined that there was no double jeopardy violation when the defendant pled guilty to manslaughter and in a separate proceeding was convicted by jury of second degree kidnapping. Citing Neville v. Butler, 867 F.2d 886 (5th Cir. *280 1989), the Coates court stated that “a defendant may be convicted of both felony murder and an underlying | ^felony if another separate felony could have served as the basis for the felony murder conviction.” The court analyzed:
Double jeopardy would exist if the state conceded or the record showed that second degree kidnapping was the basis for Coates’s manslaughter plea. Likewise, he would have a claim of double jeopardy if he pleaded not guilty and the state at trial relied on second degree kidnapping to prove manslaughter.
[[Image here]]
[T]he state was not confined to proving second degree kidnapping as the underlying felony, but could have used armed robbery (14:31A(1), 14:30), or another felony such as aggravated battery (14:31A(2)(a)) or simply shown specific intent to kill or inflict great bodily harm (14:31A(1), 14:30.1), In any event, because Coates pled guilty to manslaughter and waived trial, it was not necessary for the state to particularize its theory of the case.
The analysis in Coates suggests that, if another separate felony could have served as the basis for the felony murder conviction, there would not be a violation of double jeopardy in the case sub judice. We note that the jury in this case was instructed as to two possible underlying felonies-aggravated burglary and armed robbery. Here, the state conceded on appeal that it proved the underlying felony of aggravated burglary, but never argued that it proved second degree murder based on specific intent or armed robbery. As discussed above, the record in this case does not support a finding of specific intent. Had the state proved second degree murder based on the underlying felony of armed robbery, it is possible that double jeopardy might not exist. However, because aggravated burglary provides the sole basis for the second degree murder conviction, Defendant’s convictions for second degree murder and aggravated burglary violate the prohibition against double jeopardy.
It would have been helpful to all reviewing courts had the state made it clear which crime was intended as the predicate for felony murder and |30which crime was being prosecuted on a stand-alone basis. From this record we are unable to conclude that the predicate underlying felony was not aggravated burglary. When confusion like this exists, lenity dictates the finding of double jeopardy.
Accordingly, this assignment of error has merit.
The remedy for a double jeopardy violation is that the less severely punishable conviction and sentence are vacated. State ex rel. Boyd v. State, 98-0378 (La.10/9/98), 720 So.2d 667. Accordingly, Defendant’s conviction and sentence for the less severely punishable offense of aggravated burglary are vacated.

Motion to Suppress

Defendant argues that the trial court erred when it denied his motion to suppress his confession that was the product of fear, duress, intimidation, menaces, threats, inducements and/or promises. He states that he was questioned for many hours by detectives over a two-day period, but that only approximately 90 minutes of the interrogations were recorded. He alleges that the interrogations took a mental and physical toll on him and his mother. He states that, when he was first questioned, he was not advised of his rights as a juvenile being questioned by law enforcement officers, was not advised of his Miranda rights and was not truthfully informed of the nature of the questioning. *281 He alleges that he was not informed of his rights until after he made incriminating statements, was threatened with arrest if he did not answer questions truthfully and was restrained in a police vehicle. He also states that these interrogations continued after his mother requested that all questioning stop so that she could retain an attorney for him. He contends that he was subjected to conduct that would have caused a reasonable person [ 31in his situation to believe that he had to confess. He states that, as a 15-year-old high school student who was misled as to the charges being investigated, he was particularly vulnerable to the psychological, mental and physical pressures that such circumstances presented and to the threats he and his mother experienced. He argues that the state failed to prove that his statements were made voluntarily; and, therefore, the trial court should have suppressed the involuntarily made statements.
The state argues that the totality of the circumstances and the testimony given at the motion to suppress hearing demonstrate that Defendant’s statements to Det. Brinkman, in the presence of his mother, were made freely and voluntarily. It notes that Defendant and his mother were given the Miranda warnings. The state also contends that it rebutted Defendant’s claims of police misconduct. It- argues that Defendant failed to show that the state’s conduct during the interview coerced his statement or rendered his confession involuntary.
A defendant may move on any constitutional ground to suppress a confession or statement of any nature made by the defendant. La. C. Cr. P. art. 703(B). On the trial of a motion to suppress, the burden of proof is on the defendant to prove the ground of his. motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant. La. C. Cr. P. art. 703(D).. Before what purports to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451.
|32The constitutional protections of the privilege against self-incrimination and the right to counsel apply equally to adults and juveniles. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); State v. Fernandez, 96-2719 (La.4/14/98), 712 So.2d 485; State v. Fisher, 46,997 (La.App.2d Cir.2/29/12), 87 So.3d 189.
Before using a defendant’s confession at trial, the state must establish that the defendant was informed of his rights against self-incrimination and to have an attorney present at any interrogation; that he fully understood the consequences of waiving those rights; and that he, in fact, voluntarily waived those rights without coercion. State v. Fernandez, supra, citing Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and La. Const. Art. 1, § 13. A confession by a juvenile given without a knowing and voluntary waiver can be, and should be, suppressed under the totality of circumstances standard applicable to adult's, supplemented by consideration of other very significant factors relevant to the juvenile status of the accused. State v. Fernandez, supra-, State v. Fisher, supra. Factors to consider include the juvenile’s age, experience, education, background and intelligence and whether he had the capacity to understand the warnings given him, the nature of his rights and the consequences of waiving those rights. State v. Fernandez, supra, citing Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).
*282 The admissibility of a confession is a question for the trial judge, whose conclusions on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility should not be overturned on appeal unless they are not supported by the evidence. State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000). Testimony of the interviewing police officer alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Bowers, 39,970 (La.App.2d Cir.8/19/05), 909 So.2d 1038.
A hearing on Defendant’s motion to suppress was held on April 23-25, 2013. Ofc. Brinkman and Trisa Thomas testified. The trial court listened to all four recorded statements, and the two forms for interrogation of juveniles were entered into evidence.
Ofc. Brinkman testified that Defendant became involved in this case when Randy Andrew mentioned his name during an interview about the pawning of the PS3. She stated that he was “absolutely not” a suspect in the homicide and that the purpose of interviewing Defendant was to compare his statement to that of Randy Andrew and to “poke holes in Taurus’s story” about a PS3 being stolen during the homicide. When she first met with Defendant and his mother on Oct. 11, 2012, she presented them with a two-sided form for interrogation of juveniles. She read them their rights listed on the first side of the form[5] and then walked away so that they could have privacy to discuss whether they wanted to proceed. She then came back and read them the second side of the form, which addresses each part of the
| ¡^Miranda rights separately to make sure Defendant and his mother understood each component of the Miranda rights. She repeated this process with a second form on Oct. 12, 2012, when she met with Defendant and his mother for fimther questioning. Ms. Thomas recalled signing these forms. Three recorded interviews were taken on Oct. 12, 2012; and, before each interview, she reviewed Defendant’s rights and referenced the form. At the end of the October 11 interview and two of the interviews on October 12, she asked Defendant and his mother if any promises had been made, and each time they answered in the negative.
At the suppression hearing, Ms. Thomas stated that, to her knowledge, Defendant was never interviewed when she was not present. During the first interview on October 12, she asked if Defendant was going to go to jail and expressed that she did not want to hear any more questioning. Ofc. Brinkman replied that she did not have an answer yet as to whether Defendant would go to jail and explained the importance of finishing, the interview. She also asked Ms. Thomas if she would like to sit outside the room, .but stressed that she would need her permission to continue interviewing Defendant if she chose to leave the room. Thereafter, Ms. Thomas agreed that Defendant could finish telling his story, and she remained in the room during *283 the interview. She also testified as to her education and employment background and to Defendant’s education, noting that he always made grades of A and B in school.
The state demonstrated that Defendant’s statements were free and voluntary and were not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. Through the forms for interrogation of juveniles and the recorded statemehts in which Ofc. | aF,Brinkman recited the' Miranda rights, the state established that Defendant and his mother were informed of his rights, that they both understood his rights and that they voluntarily waived those rights without coercion. We find that the trial court did not err in determining that Defendant’s confession was admissible and, therefore, did not err in denying his motion to suppress.
Accordingly, this assignment of error lacks merit.

Inconsistent Statements

Defendant argues that the trial court erred when it failed to allow full cross-examination of witnesses regarding prior inconsistent statements and failed to allow the use of such statements as substantive evidence, violating Defendant’s constitutional and statutory rights. He contends that Robert McHenry gave numerous contradictory statements and testified at trial in a manner inconsistent with at least some of those statements. He also states' that Raquel1 Davis testified at trial in a manner inconsistent with her initial statement to police. He alleges that his counsel was limited by the trial court in his cross-examination of Mr. McHenry and Ms. Davis, which. prejudicially prevented the jury from having a full understanding of the evidence that supported his defense that he did not burglarize Taurus’s home on the night Ms. Winbush was murdered. He contends that their initial statements to police established a reasonable probability of misidentification and/or demonstrated that the state could not exclude every reasonable hypothesis of innocence. He also argues that, if full cross-examination of Mr. McHenry and Ms. Davis had been allowed and if their prior inconsistent statements had been allowed as substantive evidence, the state’s inability to prove his guilt would have become clearer and more concrete.
| ¡¡(¡The state contends that Defendant’s claim that the trial court limited his cross-examination of Mr. McHenry and Ms. Davis is being raised for the first time on appeal. It states that, during the cross-examinations of both witnesses, defense counsel did not reserve a contemporaneous objection as to the" trial court’s ruling that is alleged to be error on appeal. It argues that any error was harmless and did not contribute to the guilty verdict.
During the cross-examination of both Ms. Davis and Mr.= McHenry, the defense attempted to demonstrate that the testimony given by the witnesses on direct examination was inconsistent with statements they previously made to law enforcement.
During the cross-examination -of Ms. Davife, the following exchange occurred:
[Defense Counsel:] So if the detective put in her report that you told her that you’d walked down, to borrow a dollar from Taurus and saw him standing there with Demetrius Carter, Robert McHen-ry and the man called Crazy Chris at 9:30 p.m. that .night, the detective would be wrong?
[Ms. Davis:] She got to be wrong.
[Defense Counsel:] Can you think of any reason why she would have made that mistake?
[Ms. Davis:] No.
*284 [Prosecutor:] Your Honor, I’m going to Object.
[Ms. Davis:] No, sir.
[The Trial Court:] Sustained,
[Defense Counsel:] Do you know who Crazy Chris is? '
[Ms. Davis:] I do not know who Crazy Chris is.
Defense counsel then continued with his cross-examination of Ms. Davis and did not raise a . contemporaneous objection to the trial court’s ruling.
| .^During the cross-examination of Mr. McHenry, defense counsel repeatedly asked if Taurus’s family threatened him. The prosecutor objected,' and the trial court sustained the objection, noting that the question had been asked and answered “ábout five times.” Defense counsel did not raise a contemporaneous objection to the trial court’s ruling. Defense counsel then continued' his cross-examination of Mr. McHenry and asked him to read ■ a statement he had made to a police officer. Mr. McHenry admitted that he could not read. Defense counsel then stated that he would read the statement for Mr. McHen-ry, and the prosecutor objected to defense counsel reading the statement. Defense counsel responded that he would rephrase the question, and cross-examination continued.
In both instances, the defense failed to object to the Court’s ruling- sustaining the objection'of the prosecutor. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C. Cr. P. art. 841(A). Therefore; Defendant waived his right to complain of any error in the ruling on appeal.
Accordingly, this assignment of error lacks merit.

CONCLUSION

For the foregoing reasons, we affirm the conviction and sentence of Defendant Tre-mond Thomas for second degree murder and vacate his conviction and sentence for aggravated burglary.
AFFIRMED IN PART, VACATED IN PART.
APPLICATION FOR REHEARING
Before WILLIAMS, CARAWAY, DREW, PITMAN and STONE, JJ.
Rehearing denied.
CARAWAY, J., would grant rehearing.

. We note that the date stated in the bill of information is the date Defendant was inter *266 viewed about, and arrested for, the crime, not the date of its commission,

. Defendant and his mother signed a form for interrogation of juveniles on October 11, 2012, and on October 12, 2012. Both forms were entered into evidence.

. In the case sub judice, the jury was charged as to second degree much, in part, as follows:
Thus, in order to convict the defendant of second degree murder, you must find:
(1) that the defendant killed Iesha Win-bush; and
(2) that the defendant acted with a specific intent to kill or to inflict great bodily harm. OR
(1) that defendant killed Iesha Winbush; and
(2) that the defendant was engaged in the perpetration or attempted perpetration of aggravated burglary or armed robbery even though he had no intent to kill or inflect great bodily harm.

. We note that this statute was amended by 2014 La. Acts 791, § 7. The version of the statute cited in this opinion is the pre-2014 version, which was in effect when the crime was committed.

. The first side of the form states in part:
You have the right to remain silent.
Anything you say can be used against you, You have the right to talk to a lawyer for advice before you answer any questions and you may have the lawyer with you during questioning.
If you want a lawyer during questioning but you cannot afford one, a lawyer will be provided for you prior to questioning at no cost to you.
If you decide to answer questions now without a lawyer present, you still have the right to stop answering questions at any time in order to get the advice of a lawyer or for any other reason you might have.