## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-173

**STATE OF LOUISIANA**

**VERSUS**

**TRISTAN ROMERO**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 15-1357
HONORABLE LEWIS H. PITMAN, JR., DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## VAN H. KYZAR
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Billy Howard Ezell, John E. Conery, and Van H. Kyzar, Judges.

**AFFIRMED AS AMENDED AND REMANDED.**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P. O. Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Tristan Romero**

**M. Bofill Duhe**
**District Attorney**
**W. Claire Howington**
**Assistant District Attorney**
**Iberia Parish**
**300 Iberia Street, Suite 200**
**New Iberia, LA 70560**
**(337) 369-4420**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
      **State of Louisiana**

**KYZAR, Judge.**

Defendant appeals his convictions and sentences for attempted first degree murder, armed robbery with a firearm, and intimidation of a witness. For the reasons herein set forth, we amend the conviction for attempted first degree murder to that of attempted second degree murder, remand for resentencing for this offense, affirm the conviction and sentence for armed robbery with a firearm, and affirm the conviction and sentence for intimidation of a witness.

## FACTS AND PROCEDURAL HISTORY

Defendant, Tristan Romero[1], was charged by bill of information filed on September 23, 2015, with attempted first degree murder, a violation of La.R.S. 14:27 and La.R.S. 14:30, armed robbery with the use of a firearm, a violation of La.R.S. 14:64 and La.R.S. 14:64.3, and intimidating a witness, a violation of La.R.S. 14:129.1. An amended bill was filed on January 14, 2016.[2]

Jury selection began on March 28, 2017. During the trial, it was established that the victim of the attempted murder and robbery, Thaddeus Davis, was in the driver's seat of his car in line at the drive-thru at the Red Barn store in New Iberia, Louisiana, on May 25, 2015. Defendant and two other men entered Davis's vehicle. Defendant demanded Davis's money, but then shot Davis after he threw the money out of the car. The bullet struck Davis in the left arm and shoulder area. The three men then fled, without picking up the money Davis threw on the ground.

Mr. Dana Lopez was also in the drive-thru line at the Red Barn at the time of the shooting. He was a passenger in the vehicle in front of the one driven by Davis. Defendant later approached Lopez on the street, picked up a milk crate,

---

[1] Defendant is referred to as both Tristan and Triston throughout the record. For the purposes of clarity, we shall refer to Defendant as Tristan throughout.

[2] The amended bill further defined armed robbery. The amended bill did not, however, include the citation for an attempt, as it related to the charge of attempted first degree murder.

told Lopez to keep Defendant's name out of his mouth, and put the crate down. Lopez later identified Defendant in a photographic lineup as the person who shot Davis. Defendant was found guilty as charged on March 29, 2017.

A habitual offender bill was then filed on March 30, 2017. Therein, the State sought to have Defendant sentenced as a second or subsequent offender on the charge of armed robbery with a firearm. On July 31, 2017, Defendant was adjudicated a second offender and sentenced to seventy-five years at hard labor without benefit of probation, parole, or suspension of sentence for armed robbery with a firearm. He was also sentenced to fifty years at hard labor without benefit of probation, parole, or suspension of sentence for attempted first degree murder and to twenty years at hard labor for intimidation of a witness. All sentences were to be served concurrently. Defendant, through his counsel, orally moved for reconsideration of the sentences, which was denied.

Defendant filed a Motion and Order for Appeal on August 31, 2017, which was granted on September 1, 2017. The record was lodged with this court on March 12, 2021.[3]

Defendant is now before this court asserting three assignments of error: 1) the State failed to prove he was guilty as charged; 2) the convictions for both attempted first degree murder and armed robbery constitute double jeopardy; and 3) the trial court erred in denying the defense's *Batson* challenge.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are two errors patent.

---

[3]The reason for the lengthy delay in receiving the record on appeal was not disclosed.

2

First, the amended bill of information failed to provide the full citations for attempted first degree murder. This bill included the citation for first degree murder, La.R.S. 14:30, but failed to include the citation for the attempt statute, La.R.S. 14:27. It is noted that the original bill of information actually contained the proper statutory references. The erroneous citation of a statute in the charging instrument is harmless error if the error does not mislead Defendant to his prejudice. La.Code Crim.P. art. 464. Defendant does not allege any prejudice because of the incomplete citation, and, on review, we find the error harmless.

Next, the record before this court does not indicate that the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court is directed to inform Defendant of the provisions of Article 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of the opinion and to file written proof in the record that Defendant received the notice. *State v. Hutchinson*, 18-445 (La.App. 3 Cir. 12/12/18), 261 So.3d 927, *writ denied*, 19-108 (La. 5/28/19), 273 So.3d 313, *cert. denied*, __ U.S. __, 140 S.Ct. 648 (2019).

## DISCUSSION

### *Sufficiency of the Evidence*

In his first assignment of error, Defendant contends the State failed to sufficiently prove that he was guilty as charged. This assignment is segmented into three subclaims: (1) the evidence was insufficient to prove he was the shooter; (2) if the evidence proved he was the shooter, the facts do not support a finding that he had the specific intent to kill; and (3) the evidence was insufficient to prove he was guilty of intimidating Lopez into not testifying or giving a statement to police.

3

When an appellate court reviews a sufficiency of the evidence claim, the standard applied is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984). This standard has been codified by our legislature in Louisiana Code of Criminal Procedure article 821, which provides: "A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty." When circumstantial evidence is used to prove the commission of the offense, Louisiana Revised Statute § 15:438 mandates, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Neal*, 00-0674, p. 9 (La.6/29/01); 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). This is not a separate test that applies instead of a sufficiency of the evidence test when circumstantial evidence forms the basis of the conviction. *State v. Cummings*, 95-1377, p. 4 (La.2/28/96); 668 So.2d 1132, 1134. Rather, all of the evidence, both direct and circumstantial, must be sufficient under *Jackson* to convince a rational juror the defendant is guilty beyond a reasonable doubt. It is not the function of the appellate court to assess credibility or reweigh the evidence. *Id.*

*State v. Dorsey*, 10-216, pp. 42-43 (La. 9/7/11), 74 So.3d 603, 633, *cert. denied*, 566 U.S. 930, 132 S.Ct. 1859 (2012).

Detective Walter Kimble testified that he investigated the shooting of Thaddeus Davis in May 2015, and Defendant was arrested in connection with the offense. His investigation revealed that Davis was in line in his vehicle ordering food when he was approached by Defendant, robbed, and then shot. Detective Kimble searched the area and found a "spent forty round cal" and several one dollar bills. A copper jacket, which is the "sleeve that basically surrounds a projective inside of a casing," was found inside Davis's car.

Detective Kimble spoke to Davis and Dana Lopez. Lopez, who was a passenger in a vehicle in line in front of Davis, was shown a photographic lineup and identified Defendant as the man who shot Davis. The identification occurred on June 26, 2015, a month and one day after the shooting.

4

Detective Kimble determined there was video surveillance at the Red Barn. That video footage was admitted into evidence and played for the jury. At approximately two minutes and fifteen seconds into the video, a black male in a white shirt walks toward the parking lot of the Red Barn. At seven minutes, a black male in a black shirt gets into the front passenger side of a car in the drive-thru line, occupied up to that time by the driver, later determined to be the victim Thaddeus Davis. A second black male, who is wearing a white shirt, gets in the back driver's side of the same car. A third black male, who is also wearing a black shirt, subsequently gets in the back passenger seat. The three men in the passenger seats all eventually get out of the car. After the man seated behind the driver gets out, he approaches the driver's door, which was opened at some point, and points a gun at the driver. The driver throws money out the open back driver's side door, the same door the man wearing a white shirt and holding the gun exited. The man with the gun neither picks up the money nor acknowledges its presence on the ground. After the man with the gun turns to run, the driver of the car gets out of the car and runs. He then returns to the car and tries to drive off.

The State then called Thaddeus Davis to testify. He stated that he was in line at the Red Barn on May 25, 2015, when Defendant opened the back door of his vehicle, pulled out a gun, and told Davis to give him everything he had. Davis testified, "I gave him everything I had," and Defendant then shot Davis in the arm.

Davis identified the driver of the jeep in front of his vehicle seen on the video by the name "Heavy" and the passenger as Dana Lopez.[4] In viewing the video tape of the incident, he again identified Defendant as the person who entered the vehicle and told him "[t]o give it up." In response to that demand, Davis stated he threw his hands in the air and "just threw what I had out my pocket on the

---

[4]Heavy was later identified as Dwight Williams.

5

ground." Davis was then shot and ran from the vehicle. He stated he did not threaten Defendant or act violently toward him, and he did not owe Defendant any money.

Davis admitted to prior convictions for distribution of cocaine, possession of cocaine, and possession of a schedule IV controlled dangerous substance. He also admitted he had previously signed an affidavit indicating Defendant did not shoot him. He testified he executed the affidavit because he did not want to press charges and then stated Defendant's mother and girlfriend asked him to sign the affidavit. The affidavit, which was completed on October 21, 2015, stated, "[Tristan] Romero was not the person that shot me, and rob [sic] me behind the Red Barn on May 27, 2015."

Davis was questioned extensively about the affidavit before the jury and explained his reasoning for its execution. Ultimately, he stated that at the time, he was out of jail, on the streets, and was approached by Defendant's mother and girlfriend, who requested that he sign an affidavit stating that Defendant did not commit the crime. The following exchange took place at trial between Defendant and the attorney for the State:

Q.   -- our deal that he's talking about was for you to come to court and tell the truth, correct?

A.   Yes, sir.

Q.   And the reason you were in jail June of 2016 was because we did a material witness warrant because you didn't appear in court for this trial, correct?

A.   Yes, sir.

Q.   Because you didn't want to be here --

A.   Yes, sir.

Q.   -- because you're scared --

6

A.     Yes, sir.

Q.     -- and you're worried? And so -- and that affidavit you signed in October of 2015 was because this defendant's mom and girlfriend came and asked you to sign this affidavit?

A.     They just -- I just -- I didn't want -- like when it first happened I didn't want to press charges or nothing, you know what I'm saying. I didn't want -- you know what I'm saying. I know I forgave so I didn't want to press charges or nothing so I felt like that at the same time just sign the affidavit to see why -- you know what I'm saying because I felt like, you know what I'm saying, God forgave me for all the things I did so, you know what I'm saying. I felt like God was going to forgive him for what he did, you know what I'm saying, so I signed the affidavit because it was over with. I just didn't want to press charges. I felt like that's the type of stuff that came with the streets so I just left it alone.

. . . .

Q.     And have I ever asked you to do anything other than tell the truth?

A.     No, sir.

Davis stated that he did not want to be in court because he was concerned for his safety and that of his family. After the exchange, Davis again identified Defendant as the man that shot him.

Dana Lopez testified that the Red Barn was a drive-thru convenience store. He and Dwight Williams were in front of Davis's vehicle at the Red Barn at the time of the incident. Lopez was shown the video footage from the drive-thru and identified himself as the passenger in the Jeep in front of Davis's vehicle. He testified that he did not see the events depicted on the footage transpire.

After the incident at the Red Barn, Lopez and Defendant had "some words." Lopez testified that he was walking his dog when Defendant approached him, stating:

Tristan walked up and he asked me, he said, "You 'Thinky." That's my nickname "Thinky." Everybody call [sic] me "Thinky." I said, "Yeah." He said, "You know who I am?" I said, "No." He said, "Well, I'm bout it." He said, "And keep my name out your mouth."

7

> And that was the end of it. I got [sic] a son that passed away the day after Thanksgiving of last year and he know [sic] Tristan and he had a talk with him and then the next time I saw Tristan he said -- we spoke, he said, "My band [sic]," you know, "we good." He said he made a mistake.

Lopez further testified about the encounter:

> Well, my dog -- first of all my dog don't like confrontation so she was probably like ready to go. So she stood up, and when things got -- he picked up a milk crate when he walked up and then he said, "Keep my name out your mouth," and he put it back down. I walked off. The next time I see him a couple of days later we was [sic] good. My son Reginald had talked to him -- [.]

"[H]e told me just simply keep his name out my mouth. Yes, that was after the incident, but I hadn't put it together." This occurred a couple of days after Davis was shot. Lopez later clarified Defendant identified himself during the encounter as "Body."[5] When asked if he was intimidated by Defendant, Lopez testified that "[k]eep my name out your mouth" was a phrase that was used while he was "coming up" and that his anxiety went way up as a result of the encounter. He went on to state that in hindsight, "I wouldn't say I was intimidated, but being my mental issues going on I could hear a pin drop in the next room and get anxious and overwhelmed and this was a lot going on to say that I didn't do anything."

After the milk crate incident, Lopez spoke to Detective Kimble. He indicated he was "picked up" by Jason Comeaux, who was with the narcotics department, and had not reported the milk crate incident prior to that time. Lopez further stated, regarding the milk crate incident, "It's not -- it's not a black and white thing, it's not clear, so if I can't express what actually happened and why it happened." He then indicated the event occurred, but he did not report it, and he would not have done so if he had not been picked up.

Lopez explained:

---

[5]Defendant's nickname is Body.

8

I'm on extreme anxiety medicine. I take Xanax, I take Norcos, I take Oxycodone . . . . I take Volumes [sic] and sometimes things like the dog incident when it happens sometimes it'll get -- like in my head, in my mind, it'll get way blown out of proportion. I got [sic] extreme anxiety and I got the paper there to show you Somas, Xanax, Oxycodone, Hydrocodone for the last three years still on it. I just got two months ago my doctor to get me off the Xanax and he went from Xanax 10 to Valuim 5's and, so I mean, sometimes I'm everywhere.

He stated he took the medication every day, including the day he was in court.

Lopez testified that he spoke to Detective Kimble after he spoke with Comeaux. Lopez was asked if what he testified to was what he told Detective Kimble. Lopez responded, "Yeah, but what I told Detective Kimble is what Jason Comeaux told me to tell Detective Kimble." Lopez stated that he wrote a statement for Comeaux, and Comeaux tore it up or threw it in the garbage. Lopez explained:

It's not what he wanted to hear, so then I wrote another statement then Detective Kimble left out [sic] the room with the statement. Jason Comeaux came back in the room with the statement, he balled it up and got rid of it. He gave me a new paper and he said he know [sic] what I want to hear. So he was saying like something like Two Hundred and Fifty Thousand Dollars ($250,000.00) bond. I just got out of drug court. I wasn't on drugs or anything like that and he was talking about, you know, using my priors against me and -- [.]

Lopez then stated that the incident with the milk crate did in fact occur, and was further questioned as follows:

Q. But now, I'm hearing you saying that, that didn't happen, that the cops told you to say something different? Told you to lie?

A. Oh, no, no. No, no. We was -- they was [sic] telling me the statement that I was writing about what happened at the stand and the fact that I said that I didn't have my glasses on. I'm a welder behind thirty years, you see I can't -- I couldn't identify you right now. Okay. Now, I didn't have my glasses on. Whatever my brother said that cause [sic] me to look back, I looked back into some tinted windows because I'm on the passenger side and that's all I saw was the inside of the car because I didn't have my glasses on.

Q. What did your brother say that caused you to look?

9

A. I don't recall what he said. He said something like, "Hey" or "watch it," or something and then I looked back. But then when I looked back it was like looking at this black board. I couldn't see anything so I looked to the side and I seen [sic] Thaddeus running holding his arm up. He had been shot. Then there was blood coming out like a water facet [sic].

Lopez testified that he could not identify Defendant as the person who shot Davis at the Red Barn. He was asked if he told Detective Kimble that he heard "'Give it up. Give it up.' 'I don't have nothing.' 'Give it up or I'm going to shoot you.' 'I don't have nothing.'" Lopez said he could not recall. When asked if he told Detective Kimble that he witnessed "Body" shoot someone, Lopez replied, "I've said a lot of things for a lot of different reasons, yes." Lopez then stated he said something like that, but he did not know why.

Lopez later signed an affidavit that a guy, whose name he could not remember, asked him to sign. He stated he felt intimidated by the guy and was overwhelmed. Lopez stated he was worried about being in harm's way. They met at Brother's Insurance where the guy told him "that's my cousin" and if Lopez signed the affidavit it would help him. Lopez assumed the guy was talking about Defendant. The affidavit was written by a female whose name he did not know, but Lopez signed it anyway. He identified the affidavit he signed, which states in part:

> I Dana Lopez was incoherent at the time of the incident that took place behind the Red Barn drive through on May 25, 2015 and also coheres [sic] to point Tristan Romero out in a photo line up by detectives of Iberia Parish Sheriff Department. In regards I do not wish to participate in the prosecution of an innocent man through the corruption of Iberia Parish Sheriff Department.

The affidavit was signed a year and a half after the events at the Red Barn.

Lopez further testified that he identified Defendant in a lineup, but it was not from seeing him at the Red Barn, because he was not able to see him at the Red

10

Barn. He identified Defendant from the "meeting" with the dog and the milk crate, when Defendant told him to keep his name out of his mouth.

Lopez admitted to having been convicted of distribution and possession of drugs and had been in and out of rehab. He stated he was strung out on crack cocaine from age seventeen to the age of thirty-five. He admitted that he had also shot up cocaine.

### *Identity as the Shooter*

Defendant alleges the evidence was insufficient to prove he was the shooter. His argument relies on the alleged intimidation of Davis and Lopez by police. Defendant points out their reluctance to be involved in the case, noting the State issued a material witness warrant for Davis, had Davis arrested, and allegedly had Davis change his story. Additionally, Lopez testified that police tore up at least one statement because it was not what they wanted to hear, and Lopez could not see the shooting or identify the shooter. Defendant asserts Lopez identified him because he was asked to identify him. While conceding that Davis identified him as the shooter, he argues that the shooter entered the vehicle from behind the driver's seat. As for the video footage, Defendant claims it does not show the shooter's face. Furthermore, the State failed to collect evidence such as fingerprints or DNA that could confirm the identity of the shooter. Defendant asserts the State failed to negate any reasonable probability of misidentification. Thus, his convictions for attempted first degree murder and armed robbery should be vacated.

> In cases where the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. *Neal*, 00-0674 at 11, 796 So.2d at 658 (citing *State v. Smith*, 430 So.2d 31, 45 (La.1983)). A positive identification by only one witness is sufficient to support a conviction. *Id.*; See *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988). A victim's or witness's testimony

11

alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. *State v. Davis*, 02-1043, p. 3 (La.6/27/03); 848 So.2d 557, 559. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the fact finder, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 02-1869, p. 16 (La.4/14/04); 874 So.2d 66, 79.

*Dorsey*, 74 So.3d at 633-34.

A review of the video surveillance shows the man who entered Davis's vehicle exited the back seat and approached the driver's door, leaving him face to face with Davis. It is clear that Davis could see the face of the man who shot him. Davis made an in-court identification of Defendant as that man. Lopez identified Defendant in a photographic lineup approximately one month after the incident. The jury heard the multitude of testimony relating to the credibility of both Davis and Lopez and chose to believe Davis's testimony that Defendant was the man who committed the robbery and attempted murder. Even without the testimony of Lopez, who stated to Detective Kimble that Defendant shot Davis, the testimony of Davis alone is sufficient when considered along with the video evidence and physical evidence. This court cannot second guess the jury's credibility determinations. The evidence, viewed in the light most favorable to the prosecution established beyond a reasonable doubt that Defendant was indeed the shooter.

### Specific Intent

Defendant next contends the facts do not support a finding that he had the specific intent to kill Davis because Davis was shot in the arm, a non-vital area not reasonably anticipated to cause death, and Davis was shot only once. Defendant argues that had the shooter wanted to kill Davis, he had the opportunity to do so. He alleges Davis was shot out of frustration that only $7.00 was acquired during

12

the robbery.[6] Defendant suggests the facts support the lesser offense of aggravated battery.

> In order to convict an individual of first-degree murder, LA.REV.STAT. § 14:30 provides that the offender must have specific intent to kill or inflict great bodily harm and be engaged in one of the enumerated felonies . . . or have the specific intent to kill or inflict great bodily harm upon more than one person. LA.REV.STAT. § 14:30(A)(3). An attempted first-degree murder requires that the offender do or omit to do an act for the purpose of and tending directly toward the accomplishing of his object and have the specific intent to kill. LA.REV.STAT. § 14:27(A). It is important to note that specific intent to inflict great bodily harm may support a conviction for murder, but in order to support a conviction for attempted murder, only specific intent to kill is sufficient. *State v. Hongo*, 96-2060, p. 2 (La.12/2/97), 706 So.2d 419, 420.
>
> . . . .
>
> Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LA.REV.STAT. § 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact but may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Graham*, 420 So.2d 1126 (La.1982).

*State v. Mitchell*, 99-3342, pp. 5-6 (La. 10/17/00), 772 So.2d 78, 82.

"Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill." *State v. Broaden*, 99-2124, p. 18 (La. 2/21/01), 780 So.2d 349, 362, *cert. denied*, 534 U.S. 884, 122 S.Ct. 192 (2001). Moreover, specific intent can be formed in an instant. *State v. Maxey*, 527 So.2d 551, 555 (La.App. 3 Cir. 1988), *writ denied*, 541 So.2d 868 (La.1989); *State v. Cousan*, 94-2503, p. 13 (La. 11/25/96), 684 So.2d 382, 390.

In *State v. Tillman*, 47,386 (La.App. 2 Cir. 8/8/12), 104 So.3d 480, *writ denied*, 12-2035 (La. 1/25/13), 105 So.3d 714, the defendant argued there was no evidence of specific intent because the victim did not suffer mortal wounds even

---

[6] $7.00 was mentioned in opening statements. However, there was no testimony indicating how much money Davis had or the amount of money police recovered at the scene.

13

though the shots were fired at close range. The second circuit noted that the victim therein was shot in the left side of his chest and stated:

> Although . . . Cortavian survived [his] injuries, the location of these injuries in the chest area implies that Tillman had an intent to kill his victim[]. The fact that Cortavian survived the shooting does not negate specific intent to kill. The simple act of pointing a gun at Cortavian Baker and firing the gun at him shows specific intent to kill. Considering these facts, we believe that any rational trier of fact could conclude that Tillman had specific intent to kill Cortavian.

*Id.* at 489.

Here, Defendant's acts in pointing the gun at Davis and firing at close range, striking him in an area of the body that could have reasonably been fatal, were sufficient to support the finding of specific intent to kill.

### *Intimidation of a Witness*

Defendant contends the record is clear that he did not commit the crime of intimidation of a witness. He alleges the State failed to prove the statement to Lopez was made with the intent to intimidate him. The State asserts that Defendant's actions were, at minimum, an attempt to influence Lopez's testimony or appearance at trial by force or threat of force.

The crime of intimidation of a witness is defined by La.R.S. 14:129.1(A)(1). The pertinent provisions of that statute provide:

> A. No person shall intentionally:
>
> (1) Intimidate or impede, by threat of force or force, or attempt to intimidate or impede, by threat of force or force, a witness or a member of his immediate family with intent to influence his testimony, his reporting of criminal conduct, or his appearance at a judicial proceeding;
>
> . . . .
>
> B. For purposes of this Section the following words shall have the following meanings:
>
> . . . .

14

(2) "Witness" means any of the following:

(a) A person who is a victim of conduct defined as a crime under the laws of this state, another state, or the United States.

(b) A person whose declaration under oath has been received in evidence in any court of this state, another state, or the United States.

(c) A person who has reported a crime to a peace officer, prosecutor, probation or parole officer, correctional officer, or judicial officer of this state, another state, or the United States.

(d) A person who has been served with a subpoena issued under authority of any court of this state, another state, or the United States, or

(e) A person who reasonably would be believed by an offender to be a witness as previously defined in this Section.

The offense requires the State to prove Defendant used force or threats of force. La.R.S. 14:129.1(A). Our first inquiry in determining whether the State proved each and every element of intimidation of the witness, Mr. Lopez, beyond a reasonable doubt, requires us to specifically look to the nature of the threat of force used. Lopez testified Defendant picked up a milk crate, told Lopez to keep his name out of his mouth, and put the milk crate down. There was no other testimony regarding the milk crate or any other acts by Defendant involving the crate, although Lopez did testify that the event caused him anxiety, as is discussed more thoroughly below. The sole issue to be resolved is whether Defendant's words, Defendant's actions, or the combination thereof constituted a threat of force, as it is clear that actual force was not used against Lopez.

After extensive research, we can find no cases with a similar factual scenario.[7] However, we find that Defendant's words telling Lopez to "keep my

---

[7] *See State v. Gauthier*, 05-1365 (La.App. 4 Cir. 9/27/06), 941 So.2d 642 (written and verbal threats to kill the victim if she reported abuse to police); *State v. Parker*, 16-1166, 17-141, 18-432 (La.App. 4 Cir. 12/12/18), 259 So.3d 1112, *writ denied*, 19-74 (La. 6/3/19), 272 So.3d 543, *and writ denied*, 19-179 (La. 6/3/19), 272 So.3d 891, *and aff'd*, 19-28 (La. 10/22/19), 285 So.3d 1041 (confronted victim with a knife at a bar and threatened to kill him); *State v. Mayeaux*, 570 So.2d 185, 193 (La.App. 5 Cir. 1990), *writ denied*, 575 So.2d 386 (La.1991) (telephone

15

name out your mouth" and his act of picking up a milk crate under the circumstances presented here, constituted threats of force. The incident took place only two days after the shooting at the Red Barn. Thus, viewing the evidence in the light most favorable to the State, we find the jury could reasonably have found that the words and actions constituted a threat of force.

This offense also requires the State to prove Defendant had the specific intent to intimidate Lopez. *State v. Johnson*, 35,339 (La.App. 2 Cir. 12/7/01), 803 So.2d 358; *State v. Parent*, 02-835 (La.App. 5 Cir. 12/30/02), 836 So.2d 494, *writ denied*, 03-491 (La. 10/31/03), 857 So.2d 472; *State v. Becnel*, 17-591 (La.App. 5 Cir. 6/27/18), 250 So.3d 1207.

*State v. Hall*, 441 So.2d 429 (La.App. 2 Cir. 11/29/1983) involved an analogous charge of public intimidation, in violation of La.R.S. 14:122, which prohibits the use of violence, force, extortionate threats, or true threats, with the intent to influence the conduct of the person threatened, in relation to his position, employment, or duty where the person threatened is a public official, public employee, grand or petit juror, or is a witness, or person about to be called as a witness upon a trial or other proceeding before any court, board, or officer authorized to hear evidence or to take testimony. It requires proof of specific intent to influence the conduct of the person threatened, just as the offense of intimidating a witness under La.R.S. 14:129.1. Therein, the second circuit set forth the requirements and law related to the sufficiency of proof of the essential element of specific intent to influence.

> Public intimidation is a specific intent crime [*State v. Daniels*, 236 La. 998, 109 So.2d 896 (1958) overruled on other grounds 129

threats to kill); *Becnel*, 250 So.3d 1207 (jail conversations with another indicating the amount of force to be used to keep person from testifying).

16

So.2d 4 (La.1961)]; thus, proof of specific intent is required as an essential element of the crime. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender *actively* desired the prescribed criminal consequences to follow the act or failure to act. La.R.S. 14:10. The controlling language contained within La.R.S. 14:122 that requires proof of specific intent is "with intent to influence his conduct". See *State v. Johnson*, 368 So.2d 719 (La.1979). [Compare *State v. Duncan*, 390 So.2d 859 (La.1980), concerning the crime of public bribery.] Thus, the statute requires proof of an intent to produce the consequence of influencing conduct, and in order to have convicted the defendant the state must have proved that the defendant had a specific intent, i.e. actively desired, to influence the conduct of Ms. Williams in relation to her position or duty as a prospective witness in the theft trial.

Attempted public intimidation is a responsive verdict to the crime charged. La.R.S. 14:27 provides:

> A. Any person who, *having a specific intent to commit a crime*, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

> B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.

> C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt. [Emphasis added.]

Thus, by the very definition of an attempt, specific intent is required to convict of an attempt to commit a crime. In order to attempt to commit a crime an offender must actively desire to cause the specific result required by a particular criminal statute [here influence the conduct of a potential witness] and do or omit an act for the purpose of and tending directly toward the accomplishing of his object. See *State v. Parish*, 405 So.2d 1080 (La.1981).

Intent, absent an admission of such by a defendant, must necessarily be proven by inferences from surrounding facts and

17

circumstances. *State v. Duncan*, supra. In all cases where an essential element of the crime is not proven by direct evidence, La.R.S. 15:438 applies:

> The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.

As an evidentiary rule, this statute restrains the factfinder in the first instance, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if *every reasonable hypothesis of innocence is excluded.* Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a question of law. *State v. Shapiro*, 431 So.2d 372 (La.1982). In applying La.R.S. 15:438, all the facts that the evidence variously tends to prove on both sides are to be considered, disregarding any choice by the factfinder favorable to the prosecution. As a matter of law, the reviewer can affirm the conviction only if the reasonable hypothesis is one favorable to the state *and* there is no extant reasonable hypothesis of innocence. *State v. Shapiro*, supra.

In the instant case, there is no direct evidence of an essential element of the crime; that is, whether the defendant acted with the requisite specific intent to influence Ms. Williams in her conduct as a potential witness. Thus, it was necessary that the state prove this element of the crime by circumstantial evidence. The test of the sufficiency of circumstantial evidence is not whether it produces the same conviction as the positive testimony of an eyewitness, but whether it produces moral conviction such as would exclude every reasonable doubt. The proof ought to be not only consistent with the defendant's guilt but inconsistent with any reasonable hypothesis of innocence. *State v. Shapiro*, supra.

Our review of the record compels us to conclude that the state did not meet its burden in this respect. The only testimony presented on behalf of the state regarding the actual circumstances surrounding the offense came from the victim and the investigating officer. It was the testimony of the victim that at no time did anyone ever warn her not to appear in court or otherwise attempt to influence her actions in connection with her role as a witness in the city court proceeding. The stated intent of the threats, as testified to by the victim, was to cause her to lose her job or to cause her physical harm. The testimony of the investigating officer was that the threats continued even after the defendant had pled guilty to the theft charge in city court. Other evidence clearly establishes that prior to her arrest on the instant charge, the defendant pled guilty to theft at her first court appearance. Considering the facts established at trial, while perhaps it might be concluded that the evidence tends to prove that the defendant acted as she did in order to influence Ms. Williams' conduct as a potential witness, it might equally be concluded that the actions of the

18

defendant were intended to accomplish another purpose, e.g. to punish or get even with Ms. Williams' for her actions in connection with defendant's arrest for theft. Thus, inferences from the proven facts developed at trial do not support a finding of moral certainty of the specific intent required to find guilt of attempted public intimidation. While we are convinced that the evidence was sufficient to prove several other crimes that the defendant may have committed in connection with her behavior toward the victim, the state chose to prosecute her for the crime of public intimidation, and by its own evidence did not exclude the reasonable hypothesis that the defendant acted for purposes of vengeance or retaliation rather than to influence the conduct of the victim in relation to her duty as a potential witness. The facts and circumstances surrounding the incidents complained of coupled with defendant's plea of guilty to the theft charge simply do not lead to an inference that these actions were done with the specific criminal intent to influence within the meaning of La.R.S. 14:122. The evidence is insufficient as a matter of law under La.R.S. 15:438. See *State v. Daniels*, supra.

Accordingly, because the evidence is insufficient to prove this element of the crime of attempted public intimidation, the defendant's conviction and sentence are reversed and she is ordered discharged. See *State v. Shapiro*, supra.

*Id.* at 431-433 (footnote omitted) (alterations in original).

Here, Defendant's intent to intimidate the witness necessarily requires proof by circumstantial evidence, as he did not admit his intent. Such can be established by inferences that logically can be drawn from surrounding facts and circumstances. Further, the content of the threats a defendant made against the witness, together with other non-verbal attempts to intimidate, can be reviewed to determine whether there was the requisite specific intent to intimidate the witness. *State v. Parent*, 02-835 (La.App. 5 Cir. 12/30/02), 836 So.2d 494, *writ denied*, 03-491 (La. 10/31/03), 857 So.2d 472. The victim's testimony about his or her perception from the threatening words or actions can also be considered. *Id.* Therein, the victim and others on her behalf testified that the victim was terrified after the defendant made multiple threats including alternately threatening to slit her throat, burn down her house, drown her, and kill her son. *Id.* at 508.

After viewing the facts and circumstances presented by the State, including the language used by Defendant to the witness and his actions in picking up an object that could have been used to harm Lopez, we conclude that the words used by Defendant could indeed have been made with the intent to intimidate and influence Mr. Lopez. The jury heard testimony as to Lopez's reactions over the confrontation with Defendant.

Q. Well, I'm not asking you to take it out of context --

A. All right. Well, let me --

Q. -- have I ever asked you to take the stand and saying anything other than the truth?

A. I just got one statement to make.

Q. Go ahead.

A. Okay. I'm on extreme anxiety medicine. I take Xanax, I take Norcos, I take Oxycodone, I take -- I got the pamphlet outside. I take Volumes and sometimes things like the dog incident when it happens sometimes it'll get -- like in my head, in my mind, it'll get way blown out of proportion. I got extreme anxiety and I got the paper there to show you Somas, Xanax, Oxycodone, Hydrocodone for the last three years still on it. I just got two months ago my doctor to get me off the Xanax and he went from Xanax 10 to Valium 5's and, so I mean, sometimes I'm everywhere.

Q. Okay. And you've been taking that --

A. You know, and when things happen -- and when things happen more so. It's like this anxiety I get overwhelmed, so that's why I wanted to explain.

While Lopez was explaining why he did not report the incident between him and Defendant after the shooting, he clearly indicates that the incident caused him anxiety at the time it occurred and had so stated earlier in his testimony. Thus, it can be inferred from this testimony, along with the fact that the words spoken, "keep my name out your mouth", together with Defendant's actions in picking up the milk crate at the same time, just after Lopez had witnessed the shooting

20

incident at the Red Barn, that Defendant made the statement with the intent to influence Lopez to either lie about Defendant's involvement or not to testify at all. *See Parent*, 836 So.2d 494.

The State met its burden of proving the elements of the charged offense. For these reasons, Defendant's conviction and sentence for intimidating a witness are affirmed.

## Double Jeopardy

In his next assignment of error, Defendant contends that his convictions and sentences for both attempted first degree murder and armed robbery, where the underlying qualifying felony was stated to be the same armed robbery, amounts to a violation of the double jeopardy clause of both the U.S. and Louisiana constitutions. U.S. Const. Amend V; La. Const. art. I, § 15. Further, La.Code Crim.P. art. 591 provides:

> No person shall be twice put in jeopardy of life or liberty for the same offense, except, when on his own motion, a new trial has been granted or judgment has been arrested, or where there has been a mistrial legally ordered under the provisions of Article 775 or ordered with the express consent of the defendant.

We note that the bill of information and the amended bill merely charged that Defendant attempted to commit first degree murder. The State did not specifically allege the manner in which it sought to prove the offense. A review of the jury instructions reveals the State relied on the enumerated felony of armed robbery:

> On Count 1, attempted first degree murder. To convict Tristan Romero of attempted first degree murder, you must find that number one, Tristan Romero actively desired to kill Thaddeus Davis; and number two, he did something for the purpose of intending directly toward killing Thaddeus Davis; and three, he was engaged in the perpetration or attempted perpetration of armed robbery.

21

As noted by Defendant, the State did not object to this instruction. In brief to this court, the State acknowledges the jury instructions show the only basis for the attempted first degree murder was the armed robbery. Thus, the State was limited to proving attempted first degree murder with the robbery charge. *See State v. Hardyway*, 52,513 (La.App. 2 Cir. 2/27/19), 266 So.3d 503, *writ denied*, 19-522 (La. 10/21/19), 280 So.3d 1156.

Recently, the Louisiana Supreme Court denounced the "same evidence" test for double jeopardy, leaving the "additional fact" test found in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), as the sole standard for the double jeopardy analysis. However, the supreme court's analysis shows that the prohibition against double jeopardy in a felony-murder situation remains extant:

> In [*State ex rel.*] *Wikberg* [*v. Henderson*, 292 So.2d 505, 508-09 (1974)] the majority, despite stating that the *Blockburger* test is not much different than the test traditionally used in Louisiana, *see Wikberg*, 292 So.2d at 508-09, engaged in a broader analysis to find that convicting a defendant for attempted armed robbery following a conviction for felony-murder arising out of the same incident violated the prohibition against double jeopardy. The majority based its conclusion on the belief that the enumerated felony underlying a felony-murder charge operates much like a lesser responsive charge while not technically amounting to such:
>
> > Of course, an essential element of the state's proof of felony-murder is the commission or attempted perpetration of the enumerated felony. The enumerated felony is therefore a different grade of the same offense (or an included offense) for double jeopardy purposes. *See* C.Cr.P. Art. 596.
> >
> > In most cases, the lesser grade or included offense is generically the same as the more severe crime charge, e.g., armed robbery and theft. In the case of felony-murder and felony-manslaughter, however, generically different offenses such as armed robbery and murder are combined into a single offense through a legal fiction, which fiction relieves the state of proving intent to kill or inflict great bodily harm. This difference

22

> may account for some of the confusion in the jurisprudence dealing with felony-murder and double jeopardy.
>
> *Wikberg*, 292 So.2d at 509. The majority noted that the legislature enacted Article 596 without the "responsiveness" requirement of former Article 279 of the 1928 Code of Criminal Procedure and thereby "broadened" the protection of the article, which view may have inspired the statement in [*State v.*] *Steele*[, 387 So.2d 1175 (La.1980)] that Louisiana law is "somewhat broader" than *Blockburger*. *See Wikberg*, 292 So.2d at 510. Chief Justice Sanders' dissent in *Wikberg* clearly perceived the majority as utilizing a broader test than used previously in Louisiana or federal courts. *See Wikberg*, 292 So.2d at 513-14. Regardless, the U.S. Supreme Court subsequently found in *Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977) (citations omitted) that "[w]hen . . . conviction of a greater crime, [felony murder], cannot be had without conviction of the lesser crime, [in this case] robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime, after conviction of the greater one." Therefore, *Harris* healed the brief schism between federal and Louisiana double jeopardy jurisprudence. The concept that Louisiana must utilize a second, broader double jeopardy analysis, however, took root well beyond the context of Article 596 and felony murder in which it arose.

*State v. Frank*, 16-1160, pp. 9-10 (La. 10/18/17), 234 So.3d 27, 33.

> . . . When double jeopardy is found, the proper remedy is to vacate the conviction and sentence for the lesser-punishable offense. *State v. Price*, 39,582 (La.App. 2 Cir. 3/23/05), 899 So.2d 633.

*State v. Taylor*, 19-620, pp. 10-12 (La.App. 3 Cir. 2/5/20), 290 So.3d 1172, 1180-81 (alterations in original), *writ denied*, 20-391 (La. 11/18/20), 304 So.3d 420.

When proof of a felony is an essential element of first degree murder, double jeopardy precludes the conviction and punishment of the defendant for both first degree murder and the underlying felony. *State v. Cox*, 07-774 (La.App. 3 Cir. 3/4/09), 4 So.3d 998, *writ denied*, 08-602 (La.9/4/09), 17 So.3d 948. In the instant case, Defendant was convicted of attempted first degree murder, where the underlying predicate offense to complete the crime was armed robbery, or

23

attempted armed robbery. La.R.S. 14:30. Thus, convictions and sentences for both offenses violate the double jeopardy clauses. In such cases, our resolution on appeal is typically to vacate the conviction and penalty for the less severe crime. *State v. Doughty*, 379 So.2d 1088 (La.1980). However, our courts have not hesitated to salvage convictions for both the attempted homicide and the underlying felony, where all the elements of a responsive verdict of the attempted homicide crime have been established. *State v. Holley*, 53,405, 53,406, 53,407 (La.App. 2 Cir. 4/22/20), 297 So.3d 180, *writ denied*, 20-923 (La. 11/10/20), 303 So.3d 1036.

Holley argues that he suffered a double jeopardy violation because the state prosecuted him for both felony murder based on aggravated arson and for the underlying felony of aggravated arson. In opposition, the state argues that the bill charged Holley with attempted first degree murder based on two independent aggravating factors – aggravated arson and the killing of more than one person – so the state could prove either one to reach a conviction. The state argues that there was no double jeopardy violation because the evidence was sufficient to establish that Holley acted with specific intent to kill more than one person, and thus the alternative aggravating factor (aggravated arson) was unnecessary for a proper conviction. The prosecution also argues that Holley waived his right to claim double jeopardy by failing to assert it in a timely motion to quash.

Holley was charged with attempted first degree murder pursuant to La. R.S.14:30 and La. R.S.14:27. First degree murder includes the killing of a human being with the specific intent to kill two or more persons. La. R.S.14:30(A)(3). First degree murder also includes the killing of a human being with specific intent to kill while engaged in aggravated arson. La. R.S.14:30(A)(1). Either way, the penalty for first degree murder is mandatory life in prison without probation, parole, or suspension of sentence (unless the prosecution seeks and obtains the death penalty). The prosecution did not and could not seek the death penalty in this case because there was no actual murder, merely attempted murder. Second degree murder includes the killing of a human being with the specific intent to kill. La. R.S.14:30.1 (A)(1). The penalty for second degree murder is mandatory life in prison without parole, probation, or suspension of sentence. The relevant provision of the attempt statute provides the same exact penalty for attempted first degree murder and attempted second degree murder, as follows:

24

> [I]f the offense so attempted is punishable by life imprisonment, he shall be imprisoned at hard labor for not less than 10 nor more than 50 years without benefit of parole, probation, or suspension of sentence.

La. R.S. 14:27(D)(1)(a).

The Federal Constitution and the Louisiana Constitution prohibit placing a person twice in jeopardy for the same offense. U.S. Const. Amend V; La. Const. art. I, § 15; La. C. Cr. P. art. 591; *State v. Hardyway*, 52,513 (La. App. 2 Cir. 2/27/19), 266 So. 3d 503, 512, *writ denied*, 19-00522 (La. 10/21/19), 280 So. 3d 1156. The guarantee against double jeopardy provides three central constitutional protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. *State v. Crandell*, 05-1060 (La. 3/10/06), 924 So. 2d 122.

In *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), the U.S. Supreme Court set out a precise rule of law to determine whether a double jeopardy violation has occurred. "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether *each* of [the statutes that define a crime charged] requires proof of a fact which the other does not." *Blockburger v. United States, supra.* (Emphasis added). Louisiana's separate "same evidence" test is no longer used in determining whether a double jeopardy violation exists. *State v. Frank*, 16-1160 (La. 10/18/17), 234 So. 3d 27.

Double jeopardy bars separate punishment of lesser included offenses once the defendant is convicted of the greater offense. *State v. Price*, 39,582 (La. App. 2 Cir. 3/23/05), 899 So.2d 633. The double jeopardy clause prohibits prosecution for both a felony murder and the underlying felony. *State v. Thomas*, 50,929 (La. App. 2 Cir. 8/10/16), 201 So. 3d 263, 278, *writ denied*, 16-1642 (La. 9/6/17), 224 So. 3d 980. To remedy a violation of double jeopardy, the reviewing court normally vacates the conviction and sentence of the less severely punishable offense, and affirms the conviction and sentence of the more severely punishable offense. *Price, supra.*

In *Thomas, supra*, cited by the defense, this Court found that the prosecution for second degree felony murder and the underlying felony of aggravated burglary constituted a double jeopardy violation because there was insufficient evidence to support a finding of second degree murder based on specific intent. *Id.* In *State v. Hardyway, supra*, the defendant was charged with attempted first degree murder, based on armed robbery, and separately, armed robbery. The bill of information and the jury instructions listed only the enumerated

25

felony of armed robbery to support the offense for attempted first degree murder, thereby making armed robbery a required element of the offense. This Court held that because the armed robbery provided the *sole* basis for the attempted first degree murder conviction, the prosecution and conviction for both felonies constituted a double jeopardy violation.

*Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), held that the Sixth Amendment right to a jury trial requires that every fact which is essential to the punishment imposed upon the defendant (other than prior convictions) must be proven to a jury beyond a reasonable doubt, as reflected by the verdict. In *Apprendi*, the defendant was convicted of a crime which carried a sentencing range of 5 to 10 years. After the conviction, but before sentencing, the prosecution moved under the New Jersey hate crime law to increase the penalty range to 10 to 20 years. The New Jersey procedure for sentencing enhancement under the hate crime statute allowed the matter to be tried by a judge, and prescribed a preponderance of the evidence burden of proof. The United States Supreme Court found this scheme unconstitutional because it deprived Apprendi of his Sixth Amendment right to have the jury determine whether or not the State had proven (beyond a reasonable doubt) his violation of the hate crime statute, *a fact which if so proven would increase the limits of the applicable sentencing range.*

In this case, Holley was charged with attempted first degree murder in that he attempted to kill a human being: (1) with specific intent to kill while engaged in aggravated arson; and/or (2) with the specific intent to kill more than one person. The verdict forms for each count of attempted first degree murder, which are contained in the record, do not specify whether the jury found Holley guilty on each count of attempted first degree murder by reason of his specific intent to kill while engaged in aggravated arson, his specific intent to kill more than one person, or both. Accordingly, *the verdict form does not preclude the possibility that the jury found Holley guilty of attempted first degree murder **only** by reason of his specific intent to kill while engaged in aggravated arson.* This, coupled with the fact that Holley was also convicted and sentenced for aggravated arson, clearly creates the possibility that Holley's convictions for attempted first degree murder and aggravated arson violated the prohibition against double jeopardy. Thus, given Holley's aggravated arson conviction, the combination of Holley's jury trial and double jeopardy rights requires that, for a valid conviction of attempted first degree murder, the jury verdict had to state or necessarily imply that the jury found that Holley had the specific intent to kill more than one person. U.S. Const. Amend. V & VI; *Crandell, supra; Apprendi, supra.* The jury verdict form did not do so.

The state contends that we should nonetheless affirm Holley's convictions and sentences for both attempted first degree murder and aggravated arson because the evidence was sufficient to support a jury

verdict for attempted first degree murder based on specific intent to kill more than one person. Doing so would violate Holley's Sixth Amendment right to a jury verdict finding each essential element of the offense proven beyond a reasonable doubt. *Apprendi, supra.*

The prosecution also argues that Holley waived the right to claim double jeopardy by failing to do so in a timely motion to quash. This argument is without merit because double jeopardy is a "jurisdictional defect," and therefore cannot be waived even via unqualified guilty plea. *State v. Dubaz,* 468 So.2d 554 (La. 1985). If the defendant cannot waive double jeopardy via unqualified guilty plea, he cannot waive it by pleading not guilty but failing to raise the issue in a timely motion to quash.

However, we find that the protection against double jeopardy and the right to a jury verdict on each element of the offense, in this case, can be satisfied without reversing any of Holley's convictions, but instead reducing his convictions for attempted first degree murder to attempted second degree murder. As charged in Holley's amended bill of indictment, attempted second degree murder is a lesser included offense of attempted first degree murder.

Therefore, the jury's verdict finding Holley guilty of attempted first degree murder necessarily included findings that the prosecution proved beyond a reasonable doubt every element of attempted second degree murder, *without* necessity of a finding of aggravated arson. Moreover, the punishment for attempted second degree murder and attempted first degree murder is exactly the same: 10 to 50 years of imprisonment at hard labor without probation, parole, or suspension of sentence. La. R.S. 14:27(D)(1)(a). Accordingly, we reduce Holley's convictions for attempted first degree murder to convictions for attempted second degree murder. Holley's sentencing exposure remains completely unchanged.

*Id. at* 184-87 (alterations in original).

In this case, the jury was instructed as to the charged offense, attempted first degree murder, and the responsive verdicts thereto, including attempted second degree murder, in pertinent part, as follows:

On Count I. attempted first degree murder. To convict Tristan Romero of attempted first degree murder, you must find that number one, Tristan Romero actively desired to kill Thaddeus Davis; and number two, he did something for the purpose of intending directly toward killing Thaddeus Davis; and three, he was engaged in the perpetration or attempted perpetration of armed robbery. If you are not convinced beyond a reasonable doubt that Tristan Romero is guilty of attempted first degree murder you must consider whether the

27

State has proved beyond a reasonable doubt that Tristan Romero is guilty of attempted second degree murder. Attempted second degree murder. To convict Tristan Romero of attempted second degree murder you must find that number one, he actively desired to kill Thaddeus Davis; and number two, he did something for the purpose of intending directly towards killing. If you're not convinced beyond a reasonable doubt that Tristan Romero is guilty of attempted second degree murder you must consider whether the State has proven beyond a reasonable doubt that Tristan Romero is guilty of attempted manslaughter.

The common elements of attempted first degree murder and attempted second degree murder are findings that the accused actively desired to kill the victim, and that the accused did something for the purpose of intending directly toward the killing of the victim. Thus, proof of the first two elements of attempted first degree murder in this case necessarily meets the burden of proof for the responsive verdict of attempted second degree murder. We have already concluded that the State adequately established that Defendant was the shooter, and that he intended to kill his victim, Mr. Davis. Accordingly, the jury's verdict that Defendant is guilty of attempted first degree murder necessarily included findings that the prosecution proved beyond a reasonable doubt every element of the responsive verdict of attempted second degree murder, without the necessity of a finding of armed robbery. We also note that the potential sentence for each of the crimes of attempted second degree murder and attempted first degree murder are the same: 10 to 50 years of imprisonment at hard labor without probation, parole, or suspension of sentence. La. R.S. 14:27(D)(1)(a). Accordingly, we amend the verdict and reduce Defendant's conviction of attempted first degree murder to attempted second degree murder, such that the plea of double jeopardy is inapplicable. As such, Defendant's sentence for the attempted first degree murder conviction is vacated and the matter remanded for sentencing on the conviction for attempted second degree murder.

28

## The Batson Challenge

In his third assignment of error, Defendant contends the trial court erred in denying his *Batson* challenge.[8] Defendant alleges the court cut off the objection at the first stage of the analysis and, thus, the record does not include a race-neutral reason from the State for striking juror Theresa Sigue. He asserts that the reasons given by the defense—pattern and lack of questioning of Mrs. Sigue by the State— easily met the low threshold burden of prima facie proof to move past the first step in the *Batson* process. Therefore, he urges, the trial court erred, and a new trial should be ordered.

> Under *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986)] and its progeny, the defendant challenging the peremptory strike must first establish a prima facie case of purposeful discrimination. Second, if a prima facie showing is made, the burden shifts to the State to articulate a neutral explanation for the challenge. Third, the trial court then must determine if the defendant has carried the ultimate burden of proving purposeful discrimination. *Batson*, 476 U.S. at 94-98, 106 S.Ct. at 1721-1724; *Johnson v. California*, 545 U.S. 162, 168, 125 S.Ct. 2410, 2416, 162 L.Ed.2d 129 (2005); *State v. Givens*, 99-3518, p. 5 (La.1/17/01), 776 So.2d 443, 448.

> To establish a prima facie case, the defendant must show: (1) the prosecutor's challenge was directed at a member of a cognizable group; (2) the challenge was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the prosecutor struck the venireperson on account of his being a member of that cognizable group. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723; *Givens*, 776 So.2d at 449. This three-prong showing by the defendant gives rise to "the necessary inference of purposeful discrimination" by the prosecutor. *State v. Duncan*, 99-2615, p. 12 (La.10/16/01), 802 So.2d 533, 544 (quoting *Batson*, 476 U.S at 96, 106 S.Ct. at 1723), cert. denied, 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002)). "The inference is 'necessary' because if such an inference cannot be drawn from the evidence presented by the defendant, he is unable to make a *prima facie* case of purposeful discrimination and his *Batson* challenge expires at the threshold." *Duncan*, 802 So.2d at 544 (quoting *State v. Green*, 94–0887, p. 28 (La.5/22/95), 655 So.2d 272, 290 n. 24). If the trial court determines the defendant failed to establish the threshold requirement of a prima facie case (step one), then the analysis is at an end and the burden never shifts to the

---

[8] *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986).

prosecutor to articulate neutral reasons (step two). *Duncan*, 802 So.2d at 544.

. . . .

In *Batson*, the Court provided two illustrative examples of factors the trial court should consider in deciding whether a defendant has made the requisite showing. A "pattern" of strikes against a cognizable group of jurors in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising challenges may support or refute an inference of discriminatory purpose. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723. The Court did not formulate any particular requirements for determining whether a defendant established a prima facie case. Rather, the Court expressed confidence in the trial judges' ability to determine the establishment of a prima facie case. *Id.* Thus, the determination of the type and quantum of proof necessary to establish a prima facie case was left to the lower courts. *Duncan*, 802 So.2d at 545. However, the establishment of a prima facie case is not to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination. *Johnson v. California*, 545 U.S. at 170, 125 S.Ct. at 2417. A defendant satisfies *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination occurred. *Id.*

*State v. Sparks*, 88-17, pp. 37-40 (La. 5/11/11), 68 So.3d 435, 468-70, *cert. denied*, 566 U.S. 908, 132 S.Ct. 1794 (2012).

[W]hat factors does the trial judge consider in evaluating whether racial discrimination occurred? Our precedents allow criminal defendants raising *Batson* challenges to present a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race. For example, defendants may present:

- statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;

- evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;

- side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;

30

- a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;

- relevant history of the State's peremptory strikes in past cases; or

- other relevant circumstances that bear upon the issue of racial discrimination.

*Flowers v. Mississippi*, ___ U.S. ___, ___, 139 S.Ct. 2228, 2243 (2019).

During jury selection, the State peremptorily challenged Theresa Sigue. Defense counsel then made a *Batson* challenge, alleging the State asked no questions to determine that Sigue would not be a fit juror and the only basis for the challenge was that she was an African American. The State noted defense counsel was required to make a prima facie showing that there was a pattern of discrimination on the basis of race. The following exchange ensued:

BY MR. BURTON [defense counsel]:

Well, Your Honor, to respond to that he's accepted one and he's challenged every other one -- every other African American that's on the jury venire and he -- that is the prima facie showing that this actual juror, potential juror, was asked no questions by the State to elicit any response to say that she wouldn't be a qualified juror.

BY THE COURT:

Let me look and see who we have now.

BY MR. VINES [the prosecutor]:

Judge, his indication that I only accepted two is not correct.

BY MR. BURTON:

Accepted one.

BY MR. VINES:

That I only accepted one is not correct. Not only Ms. Wilkins Jones, but I accepted Myra Rochon.

BY MR. BURTON:

31

You challenged her afterwards.

BY MR. VINES:

I didn't challenge her, she brought up information to us that she ended up being challenged for cause on the basis of.

BY MR. BURTON:

Oh, I'm sorry, I'm thinking of the other one that you got on a backstrike.

BY MR. VINES:

I accepted Ms. Rochon and she brought information to the Court's attention about a protective order and indicated that she could not perform her duty. I had accepted her prior to that.

BY MR. BURTON:

Your Honor, at this point of the jury she has been removed for cause, that means that he's only accepted one African American on the jury, every other African American has been challenged that who has been available to sit.

BY MR. VINES:

That's an incorrect statement.

BY THE COURT:

That's not -- there's Ms. Dugas.

BY MR. BURTON:

She's off because I -- she's not a qualified juror, Your Honor.

BY THE COURT:

I understand.

BY MR. VINES:

Ms. Rochon is no longer --

BY THE COURT:

Ms. Rochon is the one that came to us after she was qualified with concerns about the protective order.

BY MR. BURTON:

Correct.

BY THE COURT:

At the present time I show Ms. Wilkins Jones as our only African American on here.

BY MR. BURTON:

That's correct.

BY THE COURT:

That's out of, how many? Forty-two. Twenty-one in the first panel, twenty-one in the second panel, we had ten African Americans. Of those Mr. Milton was excused having been a convicted felon. Next we had Ms. Rochon who came up with cause because of her protective order. Then we had Ms. Dugas --

. . . .

BY THE COURT:

. . . I'm going to get to Ms. Jefferson. Ms. Dugas was not qualified, so that's three that were removed for cause or for not qualified. We had Ms. Decuir that I granted [a] cause challenge[] on, so that's four. We had Ms. Smothers that I granted a cause challenge, that's five. We're on Ms. Sigue at this time. So my calculations of the ten African Americans, either five were disqualified or removed for cause which means we only had one accepted. The other four appear to have been challenged by the State. If my calculations are correct and Mr. Burton's argument is that Ms. Sigue was not questioned by the State a [sic] to the ability to be fair in this matter, although the Court did ask all the questions that it needed to ask.

BY MR. VINES:

That's not the law[,] what the standard is.

BY THE COURT:

I understand. I'm speaking out loud. I'm trying to reach a decision on this. Mr. Burton, at this time I'm not willing to accept your Batson challenge.

BY MR. BURTON:

33

Note my objection for the record, Your Honor.

BY THE COURT:

I certainly shall. Let the record show I considered this in detail, counted all the African Americans that were on the pending list.

The State went on to provide reasons for its challenges to four prospective jurors. Defendant clarified his argument.

A review of the record indicates that during voir dire, Ms. Sigue was questioned by the judge as to her name and occupation and that of her spouse. The court subsequently asked general questions to all prospective jurors seated at that time and asked that jurors raise their hands if they had a response. Ms. Sigue did not respond to those questions. The State directly asked prospective jurors if they could accept the law and apply the law as given and not hold it to a higher standard than given. The transcript indicates Ms. Sigue was directly asked this question by the State, and no response was given.

Defendant contends the trial court's erroneous ruling stopped the parties from completing the record. Thus, he urges that this court cannot fully know what response the State would have offered and whether the defense could have met its burden of persuasion to show the alleged reasons were not race-neutral. Defendant contends that because four of five African Americans were challenged by the State, and Ms. Sigue was not asked any questions by the State, "there was prima facie evidence to at least inquire further into race-neutral reasons from the State." Of course, the record reflects that Ms. Sigue was asked general questions by the court, both attorneys, and was asked at least one direct question by the State's attorney.

Defendant further contends that the State did not understand the *Batson* process because the State initially stated Defendant had to show a pattern of

34

discrimination, and jurisprudence indicates that is not the only way to prove a prima facie case of discrimination. Moreover, Defendant argues that the proof offered by the defense was sufficient in that it presented a pattern and noted the lack of questioning by the prosecution. Defendant contends this evidence was sufficient for the trial court to draw an inference of discrimination. Defendant claims that because the State did not give a race-neutral reason for striking Ms. Sigue, we do not know if it was due to her lack of response to the one question she was asked. Additionally, several prospective jurors who gave no response served on the jury. As to pattern, Defendant asserts ten of forty-two prospective jurors were African American. Five of those African Americans were struck for cause, and one of the other five served on the jury. Defendant asserts striking four of the five shows a pattern.

In *State v. Thibodeaux*, 20-91 (La.App. 3 Cir. 3/17/21), 313 So.3d 445, the defendant alleged that during jury selection the State had used peremptory challenges to strike five or six African Americans, which constituted a pattern. The trial court denied the *Batson* challenge, finding it was difficult to say that African Americans were being excluded when "[w]e got five blacks out of eleven[.]" *Id.* at 463. This court found the defendant's "simple assertion of the number of black jurors stricken" was not sufficient to meet the first step of the *Batson* analysis. *Id.* at 465.

In *Thibodeaux*, this court relied on *Dorsey*, 74 So.3d 603. In *Dorsey*, the supreme court was called up to determine if the defendant established a prima facie case of purposeful discrimination. The court addressed the issue:

> In this case, the defense claims it established a prima facie case of discrimination numerically because the state used peremptory challenges to strike five of seven prospective black jurors (71%) and only six of twenty-seven prospective white jurors (22%), thereby striking black jurors at a rate of more than three times that of white

35

jurors. The district court clarified there were eight prospective black jurors available for jury selection and the state had challenged five, one was excused by the defense, one was selected for the jury, and one was available as an alternate. The district court then found the defense had established a prima facie case of purposeful discrimination and ordered the state to provide race-neutral reasons for striking the jurors. The state objected to the court's order and asked the court to articulate its reasons for finding a prima facie case of discrimination so the state could make an informed decision regarding whether it would seek appellate review. Before the court could do so, however, the state argued it only struck five out of eight black jurors, thereby lowering the percentage of black jurors struck from 71% to 62.5%. The state further claimed it struck every juror who rated himself as a "four" on the state's five-point scale, regardless of race, indicating a preference towards imposing a life sentence. When the court asked whether this was the state's race neutral reason, the state responded "it is a component of it," but further explained, "that is not a race neutral reason, that is a correction of the factual basis set for the prima facie case." Throughout its objection, the state repeatedly emphasized it was not providing its race neutral reasons for the strikes. After hearing the state's explanation, the court set aside its previous order and denied the *Batson* challenge, finding there was no systematic pattern of exclusion based upon race.

Upon review, we find no abuse of discretion in the district court's ruling. As the state noted, this Court has held bare statistics are insufficient to support a prima facie case of discrimination. *State v. Duncan*, 99-2615, p. 22 (La.10/16/01), 802 So.2d 533, 550 (citing *United States v. Moore*, 895 F.2d 484, 485 (8th Cir.1990)). In *Duncan*, the defendant argued racial discrimination could be inferred from the record, which showed that the state had struck 84% of the prospective black jurors and only 12% of the prospective white jurors, using five of its eight peremptory challenges to strike black jurors. This Court held, "there is not a per se rule that a certain number or percentage of the challenged jurors must be black in order for the court to conclude a prima facie case has been made out." 99-2615 at 22, 802 So.2d at 549-50. However, the Court explained "such number games, stemming from the reference in *Batson* to a 'pattern' of strikes, are inconsistent with the inherently fact-intense nature of determining whether the prima facie requirement has been satisfied." 99–2615 at 22, 802 So.2d at 550. This Court further held it is important for the defendant to come forward with facts, not just numbers alone, when asking the district court to find a prima facie case. *Id.* (citing *Moore*, 895 F.2d at 485). Consequently, in *Duncan* this Court held the defendant's reliance on bare statistics to support a prima facie case of race discrimination was misplaced.

Applying *Duncan* to the instant case, we hold the defendant's reliance upon statistics alone does not support a prima facie case of race discrimination. The record reveals the state struck 62% of the

prospective black jurors and about 22% of the prospective white jurors, using roughly the same number of strikes to excuse members of each race. Although there is a disparity in the state's use of its peremptory challenges, defendant failed to present any facts to support a prima facie case of purposeful discrimination, as required in *Duncan*. The defense correctly asserts *Johnson v. California* held a prosecutor's refusal to provide race-neutral reasons provides additional support for a prima facie case of discrimination, noting:

> In the unlikely hypothetical in which the prosecutor declines to respond to a trial judge's inquiry regarding his justification for making a strike, the evidence before the judge would consist not only of the original facts from which the prima facie case was established, but also the prosecutor's refusal to justify his strike in light of the court's request. Such a refusal would provide additional support for the inference of discrimination raised by a defendant's prima facie case.

545 U.S. 162, 171, n. 6, 125 S.Ct. 2410, 2417, 162 L.Ed.2d 129 (2005). It is clear from the above language, however, a prosecutor's refusal is not sufficient to raise an inference of discrimination, but may provide *further* support when a defendant has *already* set forth sufficient facts to establish a prima facie case. In this case, the state did not object to the district court's order to provide race-neutral reasons for its peremptory challenges, but rather requested clarification for the factual basis of the prima facie case. We find the state's request for clarification was motivated by a desire for the court to make a more complete record of the basis upon which the order was made before deciding whether to seek appellate review or provide its race-neutral reasons. Thus, we find the state's request provides no support for defendant's claim of discrimination.

While a pattern of racial strikes was arguably present here and in *Duncan*, since the state used five of its eight peremptory challenges to strike prospective black jurors, this Court further held in *Duncan* a pattern of strikes is only one of the multiple factors that can be considered in making this fact-intense determination. 99-2615 at 24, 802 So.2d at 551. This Court explained, "[i]ndeed, while *Batson* cites a 'pattern of strikes' as an example of the type of evidence that can give rise to an inference of discrimination, another equally significant example *Batson* cites is the voir dire." *Id.* In *State v. Jacobs*, this Court rejected a similar attempt by the defendant to rely on bare statistics to show the trial court abused its discretion in failing to find a prima facie case of discrimination. 99-0991, pp. 6-7 (La.5/15/01); 803 So.2d 933, 940. After reviewing the voir dire in each case, this Court found the jurors struck by the state were predictable targets for peremptory challenge for reasons other than race and therefore, the challenges were not exercised in a discriminatory manner. *Duncan*, 99-2615 at 25, 802 So.2d at 551; *Jacobs*, 99-0991 at 7, 803 So.2d at 940.

37

*Id.* at 616-18 (footnote omitted) (alteration in original).

Based on the cases cited herein, simply referencing the number of African American jurors struck by the State was not sufficient to meet the first step of the *Batson* analysis. While it was stated that there were originally ten prospective African American jurors on the first two panels, before five were excused as lacking qualification or for cause, there is no evidence of the racial makeup of the venire as a whole, the racial makeup of the judicial district, or any such other information as to make any statistical analysis meaningful. Such an analysis is further confounded by the State's position, and the trial court's acceptance thereof, that it indeed accepted Ms. Rochon, who was later excused for cause by the court after she brought to the attention of the court a ground for disqualification.

At the time of his *Batson* challenge, Defendant also asserted the State asked Ms. Sigue a single question. In *Alex v. Rayne Concrete Serv.*, 05-1457, 05-2344, 05-2520, p. 21 (La. 1/26/07), 951 So.2d 138, 154, the supreme court addressed the questioning of prospective jurors.

> [A]lthough there is no requirement that a litigant question a prospective juror during voir dire, the jurisprudence holds that the lack of questioning or mere cursory questioning before excluding a juror peremptorily is evidence that the explanation is a sham and a pretext for discrimination. *Miller-El* [*v. Dretke*], 545 U.S. [231] at 246, 125 S.Ct. [2317] at 2328 [(2005)], *quoting Ex parte Travis*, 776 So.2d 874, 881 (Ala.2000); *State v. Collier*, 553 So.2d [815] at 823, n. 11 [(La.1989)], *citing In re Branch*, 526 So.2d 609 (Ala.1987). The purpose of voir dire examination is to develop the prospective juror's state of mind not only to enable the trial judge to determine actual bias, but to enable counsel to exercise his intuitive judgment concerning the prospective jurors' possible bias or prejudice. *Trahan v. Odell Vinson Oil Field Contractors, Inc*, 295 So.2d 224, 227 (La.App. 3 Cir.1974). It is evident in the context of *Batson/Edmonson* that trial and appellate courts should consider the quantity and quality of either party's examination of the challenged venire member and to view the use of this tool as a means for the judiciary to ferret out sham justifications for peremptory strikes.

38

The State is not required to question prospective jurors, as noted in *Alex*. However, this case is clearly distinguishable from *Alex* because the trial court asked questions of the panel Ms. Sigue was part of. In addition, counsel for both sides addressed the jury and posed general questions to all, asking for individual responses. The State asked at least one direct question of Ms. Sigue, to which she gave no response. Additionally, *Alex* involved phase two of the *Batson* analysis, and the proceedings at hand did not proceed past the first prong. Moreover, the justifications presented by the State for its use of peremptory strikes were not considered by the trial court.

All arguments other than those regarding the number of African American jurors stricken and the lack of questioning have not been considered as they were not presented to the trial court at the time Defendant's *Batson* challenge was made. Uniform Rules—Courts of Appeal, Rule 1-3.

For these reasons, we find that this assignment of error lacks merit.

## DECREE

The Defendant's conviction and sentence for attempted first degree murder is reduced and amended to attempted second degree murder, in violation of La.R.S. 14:27 and La.R.S. 14:30.1. The case is remanded for sentencing on the amended conviction for attempted second degree murder. The convictions and sentences for armed robbery with a firearm and intimidating a witness are affirmed. The trial court is directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant

39

received the notice, or to do so in open court upon sentencing Defendant for the second degree murder conviction.

**AFFIRMED AS AMENDED AND REMANDED FOR SENTENCING WITH INSTRUCTIONS.**